FEDERAL LAND BANK, Respondent, *v.* MORRIS et al., Appellants.

(No. 8,039.)

(Submitted November 7, 1940. Decided April 4, 1941.)

(Rehearing denied October 1, 1941.)

[116 Pac. (2d) 1007.]

*Mr. George E. Hurd* and *Mr. John G. Brown,* for Appellants, submitted an original and a supplemental brief and argued the cause orally.

*Mr. Harry L. Burns* and *Mr. Albert Olden,* the latter of the Bar of Spokane, Washington, for Respondent, submitted an original and a supplemental brief and argued the cause orally.

HONORABLE ALBERT BESANCON, District Judge, sitting in place of MR. JUSTICE MORRIS, disqualified, delivered the opinion of the court.

This case involves the extent and priorities of water rights. The reservoirs, dams, ditches and flumes are the instrumentalities for the impounding and conveyance of the waters. The size and extent of the instrumentalities are of interest, but these are controlled by the amount then required, or then in good faith contemplated for beneficial use; and the whole situation here existing presents nothing new, except the storage rights, and should be governed by the laws, rules and decisions of this state relative to the acquisition and storage of water.

Hay Coulee, in Blaine county, is a rather well-defined water course, whose watershed is nothing more than rolling prairie country, and it flows only at times of heavy rains or during the spring run-off when there may have been a late, heavy snowfall.

All of the lands involved were arid, requiring irrigation, when available, to produce crops to the full extent of the soil. All of the lands were open to desert entries under federal law

and by the provisions of the Acts of Congress of March 3, 1877, and August 30, 1890, now found in 43 U. S. C., section 321. These Acts allowed the appropriation of waters on the public domain to reclaim the same, and other provisions allowed the building of dams and reservoirs under federal regulations for the storage of water, and also on the public domain. The parties met all the requirements of these provisions. True, our state laws relating to appropriation applied at that time, but the federal laws, rules and regulations bear also on the rights of these original appropriators and their intentions. None of them were trespassers.

Most of the briefs contained statements of the case. An extended restatement of such facts would serve no good purpose, as it seems such facts will sufficiently appear in this opinion.

The findings of the trial court well present the situation, and when considered with all of the evidence and the assignments of error, surely bring out all of the matters requiring our attention.

The Sadie Hedge appropriation, insofar as it relates to her ▉ desert entry, the construction of her reservoir and her first right to water for the irrigation of her lands, and the ownership of such lands at this time by the plaintiff, are not disputed, but the finding as to 148 acres irrigated by her before turning over the land to others is not supported by the evidence. It should have been 240 acres, or 720 acre feet. She testified that she irrigated 240 acres of her desert entry prior to turning over the place to McLaren, and of course, prior to the acquisition of the Garthofner rights. On a re-survey of the lands it was found that only approximately 148 acres of such irrigated lands were in what became the final boundaries of her desert claim, but the other 92 acres were in what became the Christina McLaren, Peterson and McCormick lands. In what part of such lands seems of no consequence, as now the ownership is all in the plaintiff and respondent. This testimony is not disputed, and is supported by the maps and surveys, and by other testimony. Sadie Hedge, by her appropriation, the construction

of her dams and ditches, and her acts, did appropriate water for and irrigate 240 acres prior to the time Garthofner stepped in, and she had a right to do this even if at that time a part of the 240 acres was public domain. (*Toohey* v. *Campbell,* 24 Mont. 13, 60 Pac. 396; *Smith* v. *Deniff,* 24 Mont. 20, 60 Pac. 398, 50 L. R. A. 737, 81 Am. St. Rep. 408.) Except as to such acreage, the court's findings XII, XIII, XIV and XV are fully supported by the evidence.

There is no question but that the Hedge appropriation for the irrigation of 240 acres, or 720 acre feet, is the first right in Hay Coulee. However, as to the rights acquired by the plaintiff, being the Christina McLaren, 120 acres, 360 acre feet; the Martin Peterson, 40 acres, 120 acre feet; and the William J. McCormick, 15 acres, 45 acre feet; these three a total of 175 acres, reduced by the 92 included with the first right, or a remainder of 83 acres; the placing of these rights with the first right, and of course ahead of the rights of the appellants, coming from Garthofner, is not at all supported by the evidence, and the doctrine of relation back to the time of the Hedge entry as to these three rights is clearly erroneous. It is difficult to find any other intent or purpose on the part of Sadie Hedge than to acquire a water supply for the irrigation of her desert land entry. She could not then have contemplated that other entrymen of like desert lands would come in later and acquire title to such lands and obtain water from her for irrigation; and it seems that while she and her husband lived on this land, they had no other intent and purpose than to irrigate the same from the instrumentalities she had acquired. In some way not explained by the record, McLaren acquired some interest and probably went into possession of the Hedge lands in 1905, and many years later, when Christina McLaren, Peterson and McCormick acquired squatter rights or some other interest in their desert lands, they found 92 acres irrigated, and they acquired the use of some water from McLaren, just as the court found, by permission. Such permission of course nega- tives any chance to initiate adverse rights or rights by pur-

chase, conveyance, or transactions of any other kind. There is no privity of interest shown, as between these three entrymen and Mrs. Hedge and McLaren; and certainly McLaren, under the federal land laws, could have had no interest in the lands of such three entrants. There certainly could have been no contract to sell to McLaren before they proved their entries, and this condition seems to have continued until 1913, when these entrants obtained from McLaren each a one-eighth right or interest in the Hedge water and reservoir. Later they proved up and secured patents to their desert claims, and thereafter they conveyed the lands to McLaren. When all the titles were merged in McLaren, he could use water on these lands from any source of supply that he owned. It is significant to note by the deeds, Plaintiff's Exhibits A and B, that John McLaren acquired title to the Hedge land and the reservoir under date of January 28th, 1915, and did not acquire title to the Christina McLaren, Peterson and McCormick lands until 1918. So it seems that the rights acquired for the Christina McLaren, Peterson and McCormick lands, in the respective amount of 83 acres, or 249 acre feet, should not date at any time prior to June 1, 1913, and these three rights, now owned by the plaintiff, are third in point of time on this stream, and are subsequent and inferior to the rights acquired by the appellants up to 1913.

Findings XX to XXVII, inclusive, cover very fully the Garthofner (now defendants' and appellants') rights and are well supported by the evidence, except as to the matters covered by this opinion, and we believe the evidence more than preponderates in favor of the following: Garthofner completed his reservoir in 1904, and his appropriation correctly dates from that time. In that year he irrigated approximately 50 acres, and until 1910, the year in which he sold his reservoir and his claims to the property irrigated, he did not increase his irrigation beyond 70 acres. There is no evidence that this was increased up to late in the year 1913, in which year the rights of Christina McLaren, Peterson and McCormick were acquired.

So we must find that the Garthofner rights are only for the irrigation of 70 acres, or 210 acre feet, dating from June 1, 1904, and as a right second to the Hedge, or respondent's, of 240 acres, or 720 acre feet.

The evidence clearly proves that, beginning in the late season of 1913, the purchasers of the Garthofner interests began and continued a large increase of the land irrigated from this reservoir and the rights so acquired, and the court's finding XXV details such amounts as a total and allots this to the various tracts of land. This total of 243.46 acres, without considering decimals makes the 731 acre feet to appellants in Conclusion I (b), and the same is carried into the judgment. However, the trial court dates all of this amount as of June 1, 1904, when, in accord with the evidence, 70 acres, or 210 acre feet, should date as of June 1, 1904, a second right, and 173.46 acres, or 520.38 acre feet, as of June 1, 1914, a fourth right. We admit the date of June 1, 1914, may be rather arbitrary, but this right is clearly later than the McCormick, Peterson, et al., rights, and as this right of June 1, 1914, is the last one, we observe that apparently every owner of land up and down that coulee was made a party to this action, and all of them defaulted except those who appeared in this case, and we see no harm in fixing this right at the earliest possible date that the evidence may tend to prove, and in so doing not disturb the three earlier rights.

To summarize, we find the amounts, rights and priorities of the parties to be as follows:

Hedge (now plaintiff's) for 240 acres, 720 acre feet, as of August 2, 1899, first right;

Garthofner (now defendants' and appellants') 70 acres, 210 acre feet, as of June 1, 1904, second right;

Hedge (now plaintiff's) for 83 acres, 249 acre feet, as of June 1, 1913, third right; and,

Garthofner (now defendants' and appellants') 173.46 acres, or 520.38 acre feet, as of June 1, 1914, a fourth right.

452

This seems to dispose of the appellants' specifications of error 1 to 5, and 10.

By appellants' specification 6, and the plaintiff's cross-specifications of error on their appeal Nos. 1, 2 and 3, error is assigned because of the amount of water found by the trial court necessary for the irrigation of these various lands. The plaintiff complains that the amount awarded, of 3 acre feet per acre, is not enough and that this should be increased to 4½ acre feet; while the appellants' position is that 3 acre feet per acre is too much, and that this should be reduced to 1½ acre feet. On this point it seems necessary to check the evidence. Two engineers having very high qualifications in their profession, and vast experience in other fields, being the witnesses Tucker and Metlen, as good experts generally do, very nicely disagreed. Tucker says: "From 2 to 3 acre feet delivered at the farm." Metlen stated: "A foot and a half per acre would be sufficient," and admitted he meant "1½ acre feet at the land." While from the non-expert witnesses we find the following: Connolly says: "2 acre feet at the land." Wadsworth stated they should have 3 acre feet on the McLaren lands, and it seems he also had in mind the amount actually delivered to the land. Garthofner did not seem very well qualified on what was meant by such a measurement of water. He seemed to testify that 1 acre foot per acre was sufficient. As 1 miner's inch continuous flow produces 1½ acre feet on an acre during a period of 30 days, or one month, then 1 miner's inch in continuous flow for a period of two months would produce the 3 acre feet. It seems safe to find that, in that particular region, the irrigation season extends for at least four months. So, spreading the 3 acre feet during a period of four months, it would only equal ½ miner's inch per acre in continuous flow. There is no law in Montana to the effect that 1 inch per acre should be allowed, and while the courts of the state have generally observed that as a rule of measurement, many of the later decisions of this court, it seems, have held to the correct rule, that is, the requirements of the lands

for adaptable crops should fix the amount of water required in that particular locality. (*Worden* v. *Anderson,* 108 Mont. 208, 90 Pac. (2d) 160, and cases there cited.) Again, as to the evidence, while that of the experts is very valuable on location and measurements, still the testimony of the men on the land, who know the soil, the kind of crops that can be raised on it, and who have spread the water and dug into that soil, and watched the effect during the entire growing season, brings in evidence of considerable weight. We are also mindful of the fact that the learned trial judge, living in that vicinity, familiar with the lands and the kind of crops grown there, is in a far better position correctly to weigh the evidence on this point than we, who have probably no acquaintance with such lands or surroundings. The findings of the trial court of 3 acre feet per acre on all of the lands involved in this action should not be disturbed.

In some of the replies are found allegations to the effect that the rights acquired by Garthofner, now claimed by the appellants, were abandoned. This is brought up by cross-specification of error No. 3, in which the claim is made that the appellants' land should not now be awarded any more than for the purpose of watering stock and sheep. This position cannot be supported. Abandonment is of course a question of fact, and the mere fact that, during a period of years, there was insufficient water capable of being reservoired to irrigate lands, and only enough to water the stock, certainly does not present a question of abandonment. The evidence does not at all support abandonment, either in act or intention, and the present claim of the appellants to 731 acre feet for the irrigation of their lands, and dating as we find, is more than supported by an overwhelming preponderance of the evidence.

The foregoing is all on the matter of appropriation and use; and we will now consider the reservoir rights of the parties. The lower court found, by its Finding XIV, that the Hedge reservoir, when constructed, had a carrying capacity of approximately 1,864 acre feet, and this seems to have been main-

tained to the time of the trial. The amount appropriated in the two rights now owned by the plaintiff is only 949 acre feet. The Garthofner (now appellants') reservoir was constructed with a capacity of 1,781 acre feet, which seems to have been maintained to the time of trial and is owned by appellants, and the two rights found for this reservoir total 730.38 acre feet. It is clear that both reservoirs were constructed and maintained with the intention of holding more water than required for irrigation in any one year. This could only have been done to provide for an extra supply during the wet years for use in the dry years. Could they do this at that time? We quote from *Donich* v. *Johnson,* 77 Mont. 229, 239, 250 Pac. 963, 965: "It is to the interest of the public that water be conserved for use rather than be permitted to go to waste, to the end that the arid lands of the state may be put under irrigation and thus be made productive." (*Anaconda National Bank* v. *Johnson,* 75 Mont. 401, 244 Pac. 141, 144.) Our Constitution, Article III, sec. 15, provides that the appropriation and use of these waters, as well as the sites for reservoirs necessary for collecting and storing the same, shall be held to be a public use. The impounding of water in a reservoir for the purpose of irrigation, etc., is held to be a lawful business, in *Jeffers* v. *Montana Power Co.,* 68 Mont. 114, 217 Pac. 652. We quote the following from the *Donich Case*: "The right to impound and store water has been recognized repeatedly in other opinions. (*Kelly* v. *Granite Bi-Metallic C. Min. Co.,* 41 Mont. 1, 108 Pac. 785; *Ryan* v. *Quinlan,* 45 Mont. 521, 124 Pac. 512; *Jeffers* v. *Montana Power Co.,* 68 Mont. 114, 217 Pac. 652; *Anaconda National Bank* v. *Johnson,* supra.) Indeed, the practice of impounding water in reservoirs has obtained in this state from the earliest days. It was essential in placer mining carried on by means of the ground sluice. As early as 1877 the legislature passed an Act concerning dams and reservoirs to the end that public safety might be preserved. (Laws 1877, p. 221.) This act, substantially, was carried forward until 1917, when it was amplified somewhat. (Pol. Code 1895, secs.

3440–3453; Rev. Codes 1907, secs. 2138–2151; Chapter 168, 1917 Session Laws, p. 417.) With the amplification of 1917 it appears in sections 2658–2671, Revised Codes 1921; and see sections 7117, 7118, Id.

It will be noted from our present section 7093, Revised Codes 1935, that the language, "an appropriator may impound flood, seepage, and waste waters in a reservoir and thereby appropriate the same," was only added to our statutes in 1921. We like the language used in *Windsor Reservoir & Canal Co.* v. *Lake Supply Ditch Co.,* 44 Colo. 214, 98 Pac. 729, 733, in referring to the Colorado statute on the reservoir appropriations: "These provisions mean that to each reservoir shall be decreed its respective priority, and this priority entitles the owner to fill the same once during any one year, up to its capacity, and restricts the right, upon one appropriation, to a single filling for any one year. A double filling in effect would give two priorities of the same date and of the same capacity to the same reservoir, on the same single appropriation, which is impossible in fact and in law, and, if allowed, would violate the fundamental doctrine of the law of appropriation—he who is first in time is first in right—by making a junior superior to a senior reservoir appropriator. Necessarily the capacity of a reservoir, which the statute expressly says is the extent of its appropriation, is what the reservoir will hold at one time, not what can be stored in it by successive fillings; otherwise the capacity would vary, depending not on what the reservoir will hold, but on how many times it can be filled in one year. When we speak of the capacity of a barrel or bottle, we mean the number of gallons or ounces it will hold when filled once, not many times." Also on page 734 of 98 Pac.: "The appropriation for a reservoir, in the nature of things, is measured by the quantity of water which it will hold at one filling. A reservoir appropriation, like that for a canal, cannot be made to do double duty." .

The storage of water in Montana is not new. The western part of our state is now dotted with reservoirs, usually built near the headwaters of streams. This work has been encour-

aged at all times, and the state policy in regard thereto was well expressed by Mr. Chief Justice Callaway. It comes back to nothing else but the old principle that "he who saves something that would otherwise be lost is not only to be protected in what he has saved, but commended for so doing." In Wiel on Water Rights, third edition, section 61, we find the following: "And it has also been said that, as to artificial increase in the flow of a stream, the lower owner has no interest therein and cannot, as a matter of right, insist upon its being kept up or upon any advantages to be derived therefrom." · Again, in section 279 of the same volume: "The prior appropriator further has no right to waters brought into the stream exclusively by the labor or artificial works of another man who has not intended to abandon them, for such artificial increments are not part of the natural flow."

The policy of our state in regard to storage and saving of water is well expressed in the laws relating to our present Water Conservation Board, Chapter 35, section 349.1 et seq., Montana Revised Codes.

We are satisfied that the laws of Montana that apply to the acquisition of running water equally apply to the storage and use of flood or waste water, and the doctrine of "first in time, first in right" applies to both.

Generally, and briefly, in this state what are the reservoir rights of any person? We would say that, in any year, to store for use in that or succeeding years what he has a right to use, and also any additional amounts that others would not have the right to use, and that would otherwise go to waste, seems to cover the situation in this case.

Error has been predicated on Conclusion I (c) of the court, which is Paragraph VII of the decree, and as to the first part: "That said rights are determined and fixed on the annual flow of Hay Coulee and shall not be affected by carry-overs and excess supply in any one year." It seems to be proper in protecting water that is carried over by the frugal for use in

succeeding years. However, it seems to us that the remaining language, to-wit: "by reason of unusual precipitation or deficiency of supply in any one year by reason of drouth," might very well have been left out, as we fail to see how the dry or the wet years should in any way change the rights of the parties.

Paragraph VIII of the decree might be a little uncertain, but of course this will have to be re-written to meet the views herein expressed.

Paragraph IX very properly provides for measuring devices in both reservoirs, and we find no fault with any part of this if the details seem to meet the convenience of the parties. We have in mind of course that each of these parties will put in a gauge-board, or something in their reservoirs where at a glance anyone can tell the exact number of acre feet in the reservoir at any time, and thus obviate the necessity of continually calling in engineers or others to measure the amounts of water. With this in mind, it seems that the parts of Paragraphs X and XI of the decree relating to measurements of the water might be rather burdensome to all the parties.

Because of the views expressed in this opinion, it seems most of the findings will have to be modified; likewise the conclusions and the decree, especially in view of the fact that we here find four different specified rights, instead of the two that were found by the trial court. In this opinion we have endeavored to point out the rights of the parties, as found by a preponderance of the evidence and the laws applicable thereto. The particular rules and details of operation in this case are more of a practical or engineering problem than a judicial one, and these could well be left to the parties interested; and if they require the trial court's intervention or assistance, this could be done at any time on a motion or motions for the modification of the decree.

This seems to dispose of all of the specifications of error involved in this appeal by the appellants and in the cross-appeal by the plaintiff and respondent.

The findings, conclusions and decree are therefore ordered amended and modified in accordance with this opinion, and affirmed as so modified and amended.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ANGSTMAN and ERICKSON concur.