# FILED

11/03/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0126



DA 16-0126

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2016 MT 281

GRANITE COUNTY BOARD OF COMMISSIONERS,

        Claimant, Objector and Appellee,

  v.

ESTHER J. MCDONALD,

        Objector and Appellant.

APPEAL FROM:    Montana Water Court, Cause No. 76GJ-40
                    Honorable Russ McElyea, Chief Water Judge

COUNSEL OF RECORD:

        For Appellant:

                David T. Markette, Dustin M. Chouinard, Markette & Chouinard, P.C., Hamilton, Montana

        For Appellee:

                Blaine C. Bradshaw, Granite County Attorney, Philipsburg, Montana

                          Submitted on Briefs:  July 20, 2016

                                  Decided:  November 3, 2016

Filed:

                                    Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Esther McDonald appeals from the Water Court's Order filed January 27, 2016. We affirm.

¶2 We restate the issues on appeal as follows:

*Issue one: Did the Water Court err in its interpretation of the 1906 Decree in the case of* Montana Water, Electric and Mining Co. v. Schuh?

*Issue two: Did the Water Court err in deciding whether to apply claim preclusion doctrines to limit Granite County's arguments concerning application of the* Schuh *Decree?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 This case arises from McDonald's objection to three water right claims owned by Granite County, 76GJ 40733-00, 76GJ 94401-00, and 76GJ 94402-00. The County's water claims all involve its storage of Flint Creek water in Georgetown Lake reservoir. McDonald claims senior water rights in the natural flow of Flint Creek, which she diverts from the Creek below Georgetown Lake. Both the County claims and McDonald's objections arise from the terms of the 1906 Decree in *Montana Water, Electric and Mining Co. v. Schuh,* by the Circuit Court of the United States, Ninth Circuit, District of Montana. Both parties are successors in interest to water rights decreed to parties in the *Schuh* case. Granite County is a successor to the plaintiff Montana Water, Electric and Mining Company, and McDonald is a successor to one of the defendants.

¶4 The County's predecessors built a dam on Flint Creek, creating a reservoir now known as Georgetown Lake. The purpose of the reservoir was to generate electric power. The County owns the dam and hydroelectric facility, which it acquired from the Montana

Power Company in 1997. The operation of the facility is subject to regulation by the Federal Energy Regulatory Commission (FERC). Two of the County's water rights used in the reservoir-hydroelectric facility arise from the *Schuh* Decree while the third is a subsequent use right. The County's rights total 1200 miner's inches[1] or 30 cubic feet per second. The water used for power generation is returned to Flint Creek below the dam.

## STANDARD OF REVIEW

¶5      This Court reviews a lower court's interpretation of a judgment as a question of law to determine whether it is correct. *Harland v. Anderson Ranch Co.*, 2004 MT 132, ¶ 20, 321 Mont. 338, 92 P.3d 1160.

## DISCUSSION

¶6      *Issue one: Did the Water Court err in its interpretation of the 1906 decree in the case of* Montana Water, Electric and Mining Co. v. Schuh*?*

¶7      McDonald objected to the County's water right claims in proceedings before the Water Court, contending that the *Schuh* Decree requires the County to maintain a constant flow of 30 CFS in Flint Creek below the Georgetown Lake dam during irrigation season, regardless of the amount of natural flow into the Lake. McDonald requested that "information remarks" be included with the abstract of each of the County's water rights from Flint Creek, to provide as follows:

> At all times during the irrigation season of each year the owner of this right is to let, turn down and cause to flow into the Flint Creek channel below the power generation facilities not less than 1200 miner's inches (30 CFS) of water.

---

[1] A miner's inch of water is equal to a flow of 2.5 cubic feet of water per second. Section 85-2-103(2), MCA.

3

Granite County counters that the downstream irrigators are entitled to have the natural inflow of Flint Creek released below the dam, but that it is not required to release storage water from the reservoir when the natural inflow from Flint Creek falls below 30 CFS. Granite County contends that its obligation to McDonald is to assure that the natural inflow of Flint Creek passes through Georgetown Lake and the hydroelectric facility for release back into the natural channel.

¶8 The Water Court defined "natural flow" for purposes of this case as the amount of water that would flow through a stream if there were no interference from the dam. The Water Court defined storage water as impoundment of the natural flow of a stream for use during times of low natural flow.

¶9 The Water Court considered the terms of the *Schuh* Decree as it affected the respective rights of the parties, summarized as follows: Georgetown Lake was created in 1901 when the Montana Water, Electric Power and Mining Company (the Company) built a dam across Flint Creek, creating Georgetown Lake. The Company brought the *Schuh* action because of claims by downstream irrigators that the reservoir was interfering with their senior water rights. The *Schuh* Decree determined that the average flow of Flint Creek "has not exceeded and does not exceed" 1200 miner's inches of water, but the Decree did not define the time of the year covered by that determination. The Water Court construed that flow finding to apply to the natural flow of Flint Creek during the irrigation season because the dispute before the *Schuh* Court pertained to disputes over irrigation rights. The Water Court determined that the *Schuh* Court's reference to an average flow "impliedly recognizes that natural flows vary from season to

4

season and from year to year, with actual flows often falling either above or below the described average" which is "normal on Montana streams."

¶10    The *Schuh* Court determined that the Company returned 1200 miner's inches of water to Flint Creek "without deterioration in quality or quantity," and that the Company had not impeded "the ordinary and natural flow or passage of the water of said Flint Creek." Therefore, the *Schuh* Court concluded that none of the downstream water users had been damaged by operation of the dam and hydroelectric plant. The Water Court determined that these statements by the *Schuh* Court "recognize that the [downstream water users] rights were based on natural flow."

¶11    The *Schuh* Decree also included a determination of the water rights of the downstream appropriators, totaling about 5000 miner's inches of water. The Decree listed the flow of the appropriation right of each downstream appropriator for irrigation purposes at the water duty of one and one half miner's inches of water per acre. While most of the downstream rights were senior to the Company's rights, the Decree did not grant any downstream user a right in the storage water behind the Georgetown Lake dam. The Water court noted that the *Schuh* Decree entitled the Company to continue using its water rights as long as it "uses the water in such a manner that every appropriator further down the stream shall have, during the irrigating season of each year, the use and enjoyment of it substantially *according to its natural flow*." (Emphasis added.) The Water Court reasoned that the term "every appropriator" must cover only appropriators with rights senior to those held by the Company, because the Company had no duty under

5

the principles of prior appropriation to preserve the flow of Flint Creek for junior appropriators.

¶12 The root of the present controversy is the statement in the *Schuh* Decree that during the irrigation season the Company must "let, turn down and cause to flow in the channel of said creek, to-wit Flint Creek, below its electric plant, not less than 1200 miner's inches of water." The *Schuh* Court enjoined the Company from "diverting from the channel of Flint Creek the water herein decreed to [downstream users]." At the same time, the *Schuh* Court recognized that the downstream users' rights were limited to the natural flow of Flint Creek, enjoining them from demanding that the Company release "any greater amount of water than the average natural flow of said stream which in the irrigating season of each year does not exceed 1200 miner's inches or 30 cubic feet per second of water." The Water Court determined that this language supported Granite County's argument that the *Schuh* Decree did not require it to release storage water to benefit downstream users.

¶13 Both sides moved for summary judgment in the Water Court, McDonald relying upon the portion of the *Schuh* Decree that ordered that 1200 miner's inches must be discharged into Flint Creek "at all times" during the irrigation season. The Water Court found that McDonald's position conflicts with the express recognition in the *Schuh* Decree that the rights of the downstream users were limited to the natural flow of Flint Creek and with the injunction against the downstream users from demanding any more than the natural in-flow of Flint Creek. The Water Court found no indication that the *Schuh* Court intended to depart from the established Montana precedent that "makes a

6

clear distinction between the natural flow rights held by McDonald and the storage rights held by Granite County."

¶14    The Water Court explained that limiting the downstream users to the natural flow of Flint Creek was consistent with established Montana law. The Water Court cited *Beaverhead Canal Co. v. Dillon Electric Light & Power*, 34 Mont. 135, 140, 85 P. 880, 882 (1906) (appropriator's rights are limited to the natural conditions of the stream at the time of the appropriation); *Kelly v. Granite Bi-Metallic*, 41 Mont. 1, 108 P. 785 (1910) (stored water is not available to satisfy rights of downstream users); *Donich v. Johnson*, 77 Mont. 229, 250 P. 963 (1926) (downstream users had the right to use the natural flow of the stream to the extent of their appropriations); and *Federal Land Bank v. Morris*, 112 Mont. 445, 116 P.2d 1007 (1941) (water released from artificial impoundments is not part of the natural flow). The principle of separating stored water from the natural flow is recognized by Montana statute, § 85-2-411, MCA.

¶15    The Water Court summarized the relationship between upstream storage and downstream senior appropriators:

> To summarize, downstream appropriators of irrigation rights with senior priority dates are entitled to the natural flow of a stream as it existed at the time of appropriation but they cannot demand release of water from storage when natural flows are unavailable. This has long been the rule in Montana. And, although the *Schuh* Decree did not expressly state this rule, the language of the Decree implicitly recognizes it.
>
> The *Schuh* Decree's reference to natural flow was consistent with the law applicable to storage rights. That law required operators of reservoirs to make the natural flow of a stream available to senior downstream appropriators during time of shortage. Under this rule, natural flow can only be stored when there is enough water to satisfy senior rights

7

or when senior rights are not being used. At the same time, the law on storage does not require release of lawfully impounded storage water when natural flows drop below the amounts needed by downstream irrigators.

The Water Court also rejected McDonald's contention that the *Schuh* Court made a factual finding that "natural flows in Flint Creek equal 30 CFS every day of the irrigation season." To the contrary, the Water Court determined that read in context, the *Schuh* Decree enjoined the downstream users' demands for water beyond a greater amount of water than the amount of natural flow of the stream above the dam. Further, the water Court determined that the statement in the Decree that the flow of Flint Creek "has not exceeded and does not exceed twelve hundred (1200) miner's inches" was only an observation that natural flows *average* that amount of water. The Water Court determined that the Court in *Schuh* was undoubtedly aware "that stream flows vary from year to year and from month to month within the same year." In conclusion, the Water Court determined that the *Schuh* Decree's instruction to release 1200 miner's inches "at all times" was designed to ensure that whatever the Company used for hydroelectric generation was returned to the stream rather than being diverted elsewhere. "It was not a literal command to release 1200 miner's inches every day of the irrigation season regardless of how much water was naturally available in Flint Creek."

¶16    Accordingly, the Water Court denied McDonald's motion for summary judgment and denied McDonald's request to add "information remarks" to the statements of the County's water rights.

8

¶17 Turning to the County's motion for summary judgment, the Water Court reiterated its construction that the *Schuh* Decree did not direct that the downstream irrigators receive a benefit—mandatory release of storage water—that the law does not provide. The Water Court determined that water lawfully impounded in Georgetown Lake is not "subject to a servitude in favor of downstream irrigators requiring releases to supplement the natural flows of Flint Creek."

¶18 The Water Court concluded:

> The Court in Schuh did not intend to obligate the owner of Georgetown Lake to supplement the natural flows of Flint Creek with storage water. Granite County's water rights are not subject to a condition requiring use of storage water from Georgetown Lake to maintain 30 CFS flows in Flint Creek throughout the irrigation season.

The Water Court granted summary judgment to Granite County, holding that its water claims to Flint Creek "are not subject to a servitude in favor of McDonald requiring releases of storage water to supplement the natural flows of Flint Creek." McDonald appeals.

¶19 This Court reviews the Water Court's interpretation of a prior decree as an issue of law, to determine whether it is correct. *Harland*, ¶ 20; *Levens v. Ballard*, 2011 MT 153, ¶ 10, 361 Mont. 108, 255 P.3d 195.

> Judgments are to have a reasonable intendment; where a judgment is susceptible of two interpretations the one will be adopted which renders it the more reasonably effective and conclusive and which makes the judgment harmonize with the facts and law of the case. It is imperative, in view of the contradictory findings and conclusions of the court in the Smith and consolidated decrees, to ascertain the intention of the court. A decree

9

will not be construed so as to result in a positive wrong where that result can possibly be avoided.

*Gans & Klein v. Sanford*, 91 Mont. 512, 522, 8 P.2d 808, 811 (1932) (internal citations omitted). When a decree is obscure or ambiguous the reviewing court may "refer to the record in the original case," *Harland*, ¶ 23, and a decree is ambiguous "if reasonable persons differ as to its effect and meaning." *Harland*, ¶ 24.

¶20 McDonald argues that the *Schuh* Decree was ambiguous and that the Water Court failed to properly apply the pleadings in that case while interpreting the Decree. She argues that the "entire purpose" of the action was to "determine a quantified flow" that the dam operator must release for downstream users. To the contrary, the Water Court expressly construed the *Schuh* Decree to require the County to release the natural inflow of Flint Creek during irrigation season, but to not require release of stored water to do so. This is entirely consistent with the pleadings that McDonald cites.

¶21 While McDonald also asserts that the Decree should be read as expressing the intent to continue the "historic" operation of the dam, this overlooks the facts that the dam was built in 1901 and the Decree was issued in 1906. So, while there was some record of the operation of the dam before the case was submitted for decision, it can hardly be relied upon as an "historic" record. The *Schuh* Decree was clearly issued in the context of established prior appropriation law. The Decree listed the name of each appropriator with rights from Flint Creek for irrigation purposes, along with the flow rate of each right and, by implication, the number of acres to be irrigated based upon the express water duty of one and one half miner's inches of water per acre. This is similar

10

to many other water adjudication decrees of the early twentieth century under Montana's law of prior appropriation. *Gwyn v. City of Philipsburg*, 156 Mont. 194, 478 P.2d 855 (1970) (City owned a dam that diverted the outflow of a mountain lake from Fred Burr Creek, into its municipal water system. Upon suit by downstream appropriators on Fred Burr Creek, this Court held that the City was required to release water "not to exceed" the natural flow from the lake whenever the water in the stream below was less than the amount required to satisfy downstream rights.). The Water Court therefore properly construed the prior Decree by concluding that a downstream appropriator has no rights to water stored behind an upstream dam as long as the dam operator releases the natural inflow into the stream below the dam.

¶22 The Water Court was tasked with construing and applying a decree drafted over 100 years ago and did so consistently with the applicable law.

¶23 *Issue two: Did the Water Court err in deciding whether to apply claim preclusion doctrines to limit Granite County's arguments concerning application of the* Schuh *Decree?*

¶24 The Water Court considered McDonald's argument that principles of claim preclusion estopped the County from contending that it was not required to release 30 CFS from Georgetown Lake continuously during the irrigation season. First, McDonald argued that res judicata barred the County from "attempting to redefine its rights" already determined in the *Schuh* Decree. The Water Court disagreed, noting that both parties "agree the narrow issue is interpretation of the rights already recognized in the *Schuh* Decree" and that "[i]nterpreting a decree is not the same as re-litigating matters already

11

decided in it." For similar reasons, the Water Court determined that the County was not collaterally estopped by the existence of the *Schuh* Decree.

¶25 The Water Court considered McDonald's argument that judicial estoppel barred the County from arguing that it was not required to make continuous releases of 30 CFS of water during the irrigation season. McDonald relied upon a statement by the County in FERC and other prior proceedings about its obligations under the *Schuh* Decree. The Water Court cited *Watkins Trust v. Lacosta*, 2004 MT 144, ¶ 33, 321 Mont. 432, 92 P.3d 620, for the principles of judicial estoppel, the purpose of which is to "suppress fraud and prevent abuse of the judicial process by deliberate shifting of positions to suit the exigencies of a particular action." The Water Court determined that McDonald's judicial estoppel argument failed because that doctrine "does not apply to changes of position relating to matters of law. Interpretation of the *Schuh* Decree involves a statement of opinion regarding a matter of law, not a statement of fact." Finding no evidence that the County intended to commit fraud or abuse the judicial process, the Water Court found that McDonald did not demonstrate all the elements of judicial estoppel.

¶26 The Water Court dismissed McDonald's argument that principles of claim preclusion estopped the County from contending that it was not required to release 30 CFS from Georgetown Lake continuously during the irrigation season. The Water Court concluded:

> Although Granite County has taken contradictory positions in other proceedings, those proceedings did not involve McDonald, and there is no evidence that Granite County meant to perpetuate a fraud or abuse the

12

judicial process. Granite County's arguments in this case are not precluded by the doctrines of res judicata, judicial estoppel or collateral estoppel.

We agree with the Water Court's conclusion that res judicata does not bar the County's arguments made in this case. The County is not attempting to re-litigate settled issues, but, like McDonald, is only arguing its case for how the ambiguities in the *Schuh* Decree should be construed. The Water Court noted that both parties "agree the narrow issue is interpretation of the rights already recognized in the *Schuh* Decree" and that "[i]nterpreting a decree is not the same as re-litigating matters already decided in it." For similar reasons, we agree with the Water Court's determination that the County was not collaterally estopped in its arguments by the existence of the *Schuh* Decree.

¶27    Therefore, the Water Court properly considered and applied the principles of claim preclusion relied upon by McDonald.

¶28    The Water Court's decision is affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE

13

Justice Laurie McKinnon, specially concurring.

¶29 I agree with the Court's conclusion that "a downstream appropriator has no rights to water stored behind an upstream dam as long as the dam operator releases the natural inflow into the stream below the dam." Opinion, ¶ 21. I write separately, however, to address what I believe was ultimately decided in the *Schuh* Decree and to recognize what remains unresolved between the parties. The provisions of the *Schuh* Decree must be read together, along with the findings regarding natural flow.

¶30 The *Schuh* Decree recognized that the Company was the owner of, and entitled to, a total of 1200 miner's inches of Flint Creek by virtue of certain appropriations made in 1888, 1889, and 1891. *Schuh* Decree, ¶ 2. The purpose and beneficial use of these appropriations was to generate electricity. *Schuh* Decree, ¶ 2. In 1901, as owner of these appropriations, the Company's predecessor completed construction of a dam, begun in 1891, for the purpose of storing water diverted pursuant to its appropriations. *Schuh* Decree, ¶ 2. In 1902, the Company filed a complaint in federal district court requesting a determination of the "amounts of water which your orator shall be compelled to allow to flow from the said storage reservoir during the irrigation season . . . ."

¶31 The *Schuh* Decree must be evaluated within the context of the Company's request to establish a quantity or amount of instream flow. The *Schuh* court found specifically that "the amount of water reasonably and necessarily required to run and operate said electric plant of the complainant to its full capacity, and which has been and now is so used by the complainant, is about 30 second feet, or 1200 miner's inches of water." *Schuh* Decree, ¶ 5. Significantly, the *Schuh* Decree further found that through its electric

14

power plant, the Company has permitted to flow down through the natural channel 1200 miner's inches of water, in such a manner that none of the downstream users have been damaged. *Schuh* Decree, ¶¶ 7, 14. More specifically, the *Schuh* court determined that the Company

> had not – during the irrigating seasons since the construction of its dam, detained or deprived the defendants of, the ordinary and natural flow or passage of the water of said Flint Creek, that is in quantities as the same would naturally run at such times, otherwise than is necessary to the reasonable and proper operation of its electric plant and machinery.

*Schuh* Decree, ¶ 9. The *Schuh* court determined the natural flow rate of Flint Creek above the dam to be 1200 miner's inches, which the Company was entitled to divert as long as it was returned to Flint Creek, *in the amount of 1200 miner's inches*, for the lands of downstream users. *Schuh* Decree, ¶ 4.

¶32 Importantly, the *Schuh* court continued to recognize entitlement by downstream water users to appropriate amounts greater than 1200 miner's inches, many of which had senior appropriation dates to the Company. *Schuh* Decree, ¶ 15. As observed by the Water Court, those combined rights far exceeded 1200 miner's inches. Therefore, the *Schuh* Decree determined *only* the amount of instream flow the Company was entitled to divert and, *thereafter return*, to Flint Creek. The *Schuh* court's conclusion that downstream users are "enjoined and restrained" from "obstructing or interfering with the use and enjoyment of said dam and reservoir and the storing of water therein," and that the natural flow was 1200 miner's inches, refers to the amount of water the court previously established as the natural flow of Flint Creek, which the Company demonstrated it could use *and return* to Flint Creek without harm to downstream

15

appropriators. *Schuh* Decree, ¶ 20. Downstream appropriators were restrained from demanding "any greater amount of water than the average natural flow" be returned for downstream appropriators. *Schuh* Decree, ¶ 20. Therefore, I agree, based on the entirety of the *Schuh* Decree, that the Company is not required to release storage water in favor of downstream users to *supplement* natural flows of Flint Creek which are below 1200 miner's inches. The *Schuh* Decree clarified instream flow which, if available, could be diverted by the Company, and returned for the lands of downstream users.

¶33 While the *Schuh* Decree made a specific finding that quantifies Flint Creek's average natural flow above the dam, it did not enjoin downstream users with senior rights from appropriating amounts in excess of 1200 miner's inches when the flow exceeded 1200 miner's inches in Flint Creek. These downstream rights, together with those of the Company, remain subject to the doctrine of prior appropriation. The Water Court correctly recognized that the law requires operators of reservoirs to make the natural flow of a stream available to senior downstream appropriators during times of shortage. Thus, natural flow can be stored only when there is enough water to satisfy senior rights, or when senior rights are not being used.

¶34 Therefore, I would clarify and definitively reject McDonald's argument that the *Schuh* Decree enjoins downstream users from appropriating no more than 1200 miner's inches during the irrigation season. In my opinion, the *Schuh* Decree established a quantity of natural flow above the dam only, and it did not enjoin downstream users with senior rights from appropriating amounts in excess of 1200 miner's inches when the flow exceeded 1200 miner's inches in Flint Creek. It similarly did not compel the Company to

16

draw from its reservoir to supplement instream flow when those rates were below 1200 miner's inches—the amount the *Schuh* Decree quantified as a finding of fact as the average instream flow.

/S/ LAURIE McKINNON

17