FILED

11/14/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0629

DA 16-0629

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 278

JAMES C. QUIGLEY and LINDA M.S. QUIGLEY,

      Claimants, Objectors and Appellants,

RICHARD L. BECK,

      Claimant, Counter-Objector and Appellee,

AVISTA CORPORATION,

      Objector.

APPEAL FROM:    Montana Water Court, Cause No. 76F-75
                  Honorable Russ McElyea, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

           Ryan K. Mattick, Moore, O'Connell & Refling, PC, Bozeman, Montana

      For Appellee:

           John E. Bloomquist, Bloomquist Law Firm, P.C., Helena, Montana

                      Submitted on Briefs:  September 6, 2017

                                 Decided:  November 14, 2017

Filed:

                                _____
                                      Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     James C. Quigley and Linda M.S. Quigley (Quigley) and Richard L. Beck assert conflicting claims of ownership over four water rights for irrigation from Nevada Creek. After presiding over a trial and conducting a site inspection, the Water Master issued a report dividing the four rights between Quigley and Beck based on a ratio of the irrigated acres owned by each party. Quigley filed objections with the Water Court. The Water Court largely adopted the Water Master's report. Quigley appeals the Water Court's order. We affirm.

¶2     We restate the issues on appeal as follows:

1. *Whether the Water Court erred in its interpretation of the 1909* Geary v. Raymond *decree;*

2. *Whether the Water Court erred in applying the clear error standard to the Water Master's findings of fact.*

### PROCEDURAL AND FACTUAL BACKGROUND

¶3     Quigley and Beck own adjoining ranches, which John W. Blair once owned as a single property known as Finn Ranch. Finn Ranch, situated in the Blackfoot River Basin, included lands in sections 27, 28, 33, and 34 of Township 12 North, Range 9 West. The lands in sections 27 and 28 now belong to Beck, and the lands in sections 33 and 34 now belong to Quigley.

¶4     In 1909, when Blair still owned Finn Ranch, the Montana Third Judicial District Court in Powell County issued a decree in the case *Geary v. Raymond* (the "*Geary* decree"), declaring the water rights of users of Nevada Creek and its tributaries. Among the rights that the district court decreed to Blair were four water rights for irrigation from

2

Nevada Creek. In 1912, Finn Ranch was split and sold. It has remained in separate ownership to the present day. No deed transfer for the properties in the ensuing years has reserved specific water rights as appurtenances to the land.

¶5 Quigley's predecessor timely filed water rights claims, including four Nevada Creek claims[1] based on the water rights decreed to Blair in the *Geary* decree. Beck's predecessor also filed four water right claims[2] for Nevada Creek based on water rights decreed to Blair in the *Geary* decree. During its review of claims in preparation for the Blackfoot River Basin Temporary Preliminary Decree, the Montana Department of Natural Resources and Conservation (DNRC) noted that the eight claims were based on the same four water rights and that each party was claiming the entirety of each of the four rights. As a result, the rights claimed exceeded the total appropriations and the DNRC attached a "decree exceeded" issue remark to the eight claims from Quigley and Beck.

¶6 Quigley filed objections against the Beck claims, and Beck filed counterobjections against the Quigley claims. The claims and objections were consolidated and assigned to a Water Master for adjudication. After discovery, the Water Master presided over a two-day trial and conducted a site visit. In his report, the Master concluded that both Quigley and Beck were successors to a portion of Blair's four Nevada Creek water rights. The Master proportionally split the flow rates of each decreed right between Quigley and Beck based on the historic number of acres irrigated on each property, using the formula

---

[1] Claim Nos. 76F 108071-00, 76F 108075-00, 76F 108076-00, and 76F 108077-00.
[2] Claim Nos. 76F 117732-00, 76 F 120974-00, 76F 120975-00 and 76F 120976-00.

3

provided in *Spaeth v. Emmett*, 142 Mont. 231, 383 P.2d 812 (1963). Under this formula, Beck received 70 percent of the decreed rights and Quigley received 30 percent.

¶7 Quigley filed objections to the Master's report with the Water Court. After briefing and a hearing, the Water Court largely adopted the Master's report.

## STANDARDS OF REVIEW

¶8 When a case involves a Water Master's report, "[t]he Water Court reviews the Master's findings of fact for clear error and the Master's conclusions of law to determine whether they are correct." *Skelton Ranch, Inc. v. Pondera Cnty. Canal & Reservoir Co.*, 2014 MT 167, ¶ 25, 375 Mont. 327, 328 P.3d 644. This Court then reviews "the Water Court's order de novo, to determine whether it correctly applied the clear error standard of review to the Master's findings of fact and whether its conclusions of law were correct." *Skelton Ranch, Inc.*, ¶ 26.

¶9 Interpretation of a judgment or decree is a question of law, which this Court reviews to determine whether it is correct. *Granite Cnty. Bd. of Comm'rs v. McDonald*, 2016 MT 281, ¶ 5, 385 Mont. 262, 383 P.3d 740.

¶10 Findings of fact are clearly erroneous if (1) substantial evidence does not support the findings of fact; (2) the fact-finder misapprehended the effect of the evidence; or (3) a review of the record leaves the court with the "definite and firm conviction that a mistake has been committed." *Marks v. 71 Ranch, LP*, 2014 MT 250, ¶ 12, 376 Mont. 340, 334 P.3d 373; *Skelton Ranch, Inc.*, ¶ 27.

4

**DISCUSSION**

¶11    *1. Whether the Water Court erred in its interpretation of the 1909* Geary v. Raymond *decree.*

¶12    Quigley contends that the Water Master and Water Court incorrectly interpreted the *Geary* decree as decreeing water rights for irrigation to all of Finn Ranch. Quigley argues that the water rights could be appurtenant only to the specific lands where Blair put the water to beneficial use. He thus contends that in order to apply established appurtenance law to the *Geary* decree, the decree must be interpreted to have incorporated Blair's answer and amended answer, which described more fully where Blair put his water rights to use.

¶13    The Water Master determined that the *Geary* decree did not attach the decreed water rights to specific parcels; rather, the water rights "were made appurtenant to all of [Blair's] land as listed in his answer to the complaint." The Water Master reasoned that the district court was specific in listing the priority dates and flow rates, and it could have been equally specific in listing the places of use had it intended such a meaning. The Water Master concluded that it would be "an exercise in speculation" to match the flow rates and priority dates listed in the decree with particular parcels mentioned in the pleadings.

¶14    The Water Court affirmed the Water Master's interpretation. First, it reasoned that the decree did not incorporate Blair's pleadings, because the claim dates and flow rates alleged in the pleadings were rejected. Second, the references to Blair's pleadings in the decree were general, and the decree made similar references to other parties' pleadings,

5

some of which were less specific than Blair's pleadings. Further, the decree specified the point of diversion and ditch for one of the four rights. The Water Court reasoned that the decree would have specified a point of diversion and ditch for each right if that was the court's intention, and that the Master properly rejected attempts to add such new findings to the decree a century later.

¶15 Interpretation of a prior court decree is an issue of law. *Granite Cnty. Bd. of Comm'rs*, ¶ 19. We review a trial court's interpretation of such a decree to determine whether it is correct. *Granite Cnty. Bd. of Comm'rs*, ¶ 19. We interpret judgments "to have a reasonable intendment; where a judgment is susceptible of two interpretations the one will be adopted which renders it the more reasonably effective and conclusive and which makes the judgment harmonize with the facts and law of the case." *Granite Cnty. Bd. of Comm'rs*, ¶ 19 (quoting *Gans & Klein Inv. Co. v. Sanford*, 91 Mont. 512, 522, 8 P.2d 808, 811 (1932)). The court may "refer to the record in the original case" if a decree is ambiguous. *Harland v. Anderson Ranch Co.*, 2004 MT 132, ¶ 23, 321 Mont. 338, 92 P.3d 1160. The court should interpret the decree to be consistent with the established and applicable law. *See Granite Cnty. Bd. of Comm'rs*, ¶¶ 21-22.

¶16 For a water right to be appurtenant to land it must be used for a beneficial purpose on that land. *See* Section 70-15-105, MCA ("A thing is deemed to be incidental or appurtenant to land when it is by right used with the land for its benefit."); *Castillo v. Kunnemann*, 197 Mont. 190, 196, 642 P.2d 1019, 1024 (1982) (quoting *Lensing v. Day & Hansen Sec. Co.*, 67 Mont. 382, 384, 215 P. 999, 1000 (1923)) ("[A] water right acquired by appropriation, and used for a beneficial and necessary purpose in connection with a

given tract of land, is an appurtenance."). A beneficial use includes "the use of water for the benefit of the appropriator" for agricultural or other uses. Section 85-2-102(4)(a), MCA.

¶17 Quigley puts great weight on the *Geary* decree's language that Blair's appropriations were "for the purpose of irrigating the lands belonging to them and described in the answer of the said John W. Blair." Quigley argues that the phrase "described in the answer" incorporates the parts of Blair's answer where he described which parcels he irrigated with which claimed water rights. However, this exact language is used throughout the decree to introduce each declaration of irrigation rights. It is not modified to indicate whether a particular party's pleadings are specific or more generalized. Read in the broader context of the entire decree, it can hardly be understood to give Blair's pleadings heightened importance. The Water Court held, and Beck does not dispute, that Blair's pleadings properly are considered in interpreting the decree and as evidence of historic water use. But the language in the decree on which Quigley relies does not mandate the interpretation of the decree that Quigley proposes.

¶18 As both the Water Master and Water Court observed, the decree rejected the appropriation dates and flow rates that Blair alleged in his answer. Quigley argues that this is not a rejection of Blair's contentions on where the water was used. We disagree. The *Geary* court did take the divisions in Blair's pleadings into account in the decree. Blair filed a single answer for claims from his two separate properties, Finn Ranch and Brazil Ranch. The district court, however, divided his appropriations into two separate groups, one for each of the two ranches. The court had two separate findings of fact—

7

identified as numerals XIX and XXVI—and two separate conclusions of law—identified as numbers 24 and 31—separating Blair's appropriations between the Finn Ranch and the Brazil Ranch. The decree properly divided the appropriations between the ranches to account for where the appropriations were being put to beneficial use. Such a division was in harmony with the law of appurtenance. *See MacLay v. Missoula Irrigation Dist.*, 90 Mont. 344, 353, 3 P.2d 286, 290 (1921) (citations omitted) ("A water right, legally acquired, is in the nature of an easement in gross, which, according to circumstances, may or may not be an easement annexed or attached to certain lands as an appurtenance thereto. When a water right is acquired by appropriation and used for a beneficial and necessary purpose in connection with a given tract of land, it is an appurtenance thereto and, as such, passes with the conveyance of the land, unless expressly reserved from the grant.") The appropriations for Blair's lands in Brazil Ranch were not, and under the law of appurtenance could not be, appurtenant to Blair's lands in Finn Ranch and vice versa. The lands in the two ranches were not in the same "given tract of land." *MacLay*, 90 Mont. at 353, 3 P.2d at 290. The law of appurtenance required this much division; it did not require more.

¶19 A review of Blair's pleadings and the decree shows that the district court declared the water rights appurtenant to the irrigated lands of each separate ranch. But the decree put few restrictions on where Blair could use the water appropriated to Finn Ranch for beneficial purposes within Finn Ranch itself. For instance, only one of the four rights from the decree at issue in this case specified a ditch—the Blair-Keiley Ditch—connected to the right. Further, in the general language of the judgment, the *Geary* decree stated

8

that the appropriators had "uninterrupted use, enjoyment and possession of the number of inches of the waters of said Nevada creek and its tributaries according to their respective priorities, and that they make a reasonable use of the waters allotted to them." Because the *Geary* decree itself did not specify parcels within Finn Ranch where the water right could be used, the rights were appurtenant to all of the irrigated lands in Finn Ranch.

¶20 We conclude that the Water Master and Water Court correctly interpreted the *Geary* decree in the context of the facts of the case and the applicable law. Blair's answer, amended answer, and pleadings do not control the place of use of the rights decreed to Blair. Therefore, the *Geary* decree itself does not prevent the Nevada Creek water rights from being made appurtenant to Beck's lands.

¶21 *2. Whether the Water Court erred in applying the clear error standard to the Water Master's findings of fact.*

¶22 Quigley argues that, aside from the *Geary* decree's declarations, there is insufficient evidence to support the Water Master's finding that all four of the Nevada Creek water rights were appurtenant to all of Beck's irrigated land. Quigley contends that the Water Court misapplied clear error analysis in upholding the Water Master's findings. Quigley first argues that Beck did not present sufficient evidence to support a finding that all four water rights were appurtenant to Beck's property. Second, Quigley argues that the Water Master misapprehended the effect of the evidence. Quigley points to evidence he presented before the Water Master that supports his position that Blair used one of the four water rights solely on what is now Quigley property, two of the water rights almost exclusively on what is now Quigley property, and only one of the

9

water rights on what is now Quigley and Beck property. Quigley argues finally that even if the Water Master did not misapprehend the effect of the evidence, the Court should be left with a firm conviction that the Water Master committed a mistake because application of the *Spaeth* formula to these four rights leaves the Quigley property with less water than the property has used historically.

¶23 The Water Court reviewed all of the evidence in the record and determined that the Water Master's findings were not in clear error. The Water Court specifically reviewed the evidence presented by Quigley to which the Water Master had assigned little weight and determined that (1) there was substantial evidence to support the Master's findings; (2) the Master did not misapprehend the evidence; and (3) the evidence as a whole did not suggest a mistake was made.

¶24 The Water Court may not simply substitute its judgment for the Water Master's when reviewing the Master's factual findings. *In re Eldorado Coop Canal Co.*, 2016 MT 94, ¶ 28, 383 Mont. 205, 369 P.3d 1034 (2016). As a reviewing court, the Water Court must review the Water Master's factual findings for clear error. *Eldorado*, ¶ 28. The Water Court may replace the Water Master's findings for one of only three reasons. First, the Water Court may correct the Water Master's findings if the findings were not supported by substantial evidence, which "need not amount to a preponderance of the evidence, but it must be more than a scintilla." *Skelton Ranch, Inc.*, ¶ 27. Second, the Water Court may determine that a finding is clearly erroneous if the Water Master misapprehended the effect of the evidence. *Skelton Ranch, Inc.*, ¶ 27. Finally, the Water Court may hold a finding clearly erroneous if, upon review of all of the evidence, it "is

10

left with the definite and firm conviction that a mistake has been committed." *Skelton Ranch, Inc.*, ¶ 27 (quoting *Heavirland v. State*, 2013 MT 313, ¶ 16, 372 Mont. 300, 311 P.3d 813). "Although conflicts may exist in the evidence presented, it is the duty of the trial judge to resolve such conflicts. Due regard is to be given the trial court's ability to judge the credibility of the witnesses." *Interstate Prod. Credit Ass'n v. DeSaye*, 250 Mont. 320, 324, 820 P.2d 1285, 1287 (1991).

¶25 Quigley argues that Beck failed to present substantial evidence that each of the four water rights is appurtenant to Beck's land. In *Castillo v. Kunnemann*, we held that existence of a decree declaring a water right appurtenant to the property before its division into smaller parcels, along with testimony that the smaller parcel was traditionally irrigated from the ditch to which the water right was assigned, were enough to establish appurtenance of the water right to the smaller parcel. *Castillo*, 197 Mont. at 195-96, 642 P.2d at 1023-24. In this case, there is no dispute that both Quigley's and Beck's lands made up the Finn Ranch previously owned by Blair and to which the *Geary* decree applies. As we discussed above, the *Geary* decree did not separate the water rights from Nevada Creek for use on specific parcels within Finn Ranch, except for a notation that one of the rights was to be appropriated through the Blair-Keiley Ditch. In addition to the decree, Beck presented witness testimony, along with other evidence, that Nevada Creek traditionally had been used to irrigate his parcels. This is substantial evidence that the Nevada Creek water rights were appurtenant to Beck's lands.

¶26 Quigley's arguments amount to disagreement over the weight that the Water Master accorded to Quigley's evidence. But a conflict in evidence does not prove

11

misapprehension of the effect of that evidence. The Water Master considered all of the evidence to which Quigley points on appeal: the pleadings and testimony from the *Geary* decree; the 1919 affidavit in contempt against a prior owner of Quigley's land; the 1959 Water Resources Survey (WRS) Field Notes and WRS Map; Water Commissioner Records; and the witness testimony. The Water Master justified the weight it gave to each of these pieces of evidence, disregarding only the 1919 affidavit. In its review, the Water Court reviewed all of the evidence again, including the 1919 affidavit, and determined that the Water Master had not misapprehended the effect of the evidence. The Water Court correctly analyzed whether the evidence had been misapprehended.

¶27 Without conclusive evidence to establish appurtenance of any given right to a specific parcel of land, the Water Master applied the formula established in *Spaeth* to assign the claimed rights between the parties. Under the *Spaeth* formula, when an owner divides a tract of land, "the appurtenant water right is divided in respective amounts to each tract measured in proportion as the number of acres irrigated with the water right on the land conveyed bears to the total number of acres irrigated by the water." *Spaeth*, 142 Mont. at 237, 383 P.2d at 815. Successors in interest cannot enlarge a water right beyond that which was conveyed. *MacLay*, 90 Mont. at 353, 3 P.2d at 290.

¶28 Quigley's last argument is that this Court should be left with a firm conviction that the Water Court made a mistake in determining that the four water rights are appurtenant to both properties, because under the *Spaeth* formula he will be apportioned less water than has been used historically on his property. Quigley points to evidence of the historical use of Nevada Creek water on his and Beck's lands. He also asserts that

12

evidence in the record demonstrates that his land needs more water than Beck's land due to soil composition.

¶29 The Water Master was called upon to resolve the DNRC issue remark that the claims exceeded the total decreed appropriation. The DNRC noted that the flow rate decreed to Blair for these four Nevada Creek water rights had been exceeded in the Quigley and Beck claims. It is a necessary outcome that at least one party will be apportioned less water than it previously claimed when the Water Court adjudicates a "decree exceeded" issue remark. We are not left with a firm conviction that the Water Master committed a mistake in resolving the issue remark when it apportioned the parties less water than they originally claimed. Quigley can receive only as much of the water right to which he was entitled. Further, the Water Court concluded that Quigley failed to prove by sufficient evidence that the *Spaeth* formula should be adjusted to allocate flow rates differently based upon any assertion of duty of water issues, such as soil differences. Although witness testimony before the Water Master referenced the different composition of the soils, Quigley provided no further evidence to the Water Master that quantified the different water requirements of the soils or demonstrated how the *Spaeth* formula should be adjusted to account for these differences. The Water Master did not clearly err in its factual findings and properly applied the formula from *Spaeth* to divide the water right given the evidence before it.

¶30 The Water Court correctly applied the clear error analysis to the Water Master's findings of fact.

13

## CONCLUSION

¶31     The Water Court's order is affirmed.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ DIRK M. SANDEFUR
/S/ JIM RICE