FILED

12/28/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0533

DA 15-0533

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 348

CLAIMANT: United States of America,
(Bureau of Land Management)

OBJECTORS: Barthelmess Ranch
Corporation; Double O Ranch, Inc.;
Lela M. French; William R. French;
Conni D. French; Craig R. French;
M Cross Cattle Company.

APPEAL FROM:     Montana Water Court, Cause No. 40M-300
                 Honorable Douglas Ritter, Water Judge

COUNSEL OF RECORD:

        For Appellants:

                John E. Bloomquist, Rachel K. Meredith (argued), Bloomquist Law
                Firm, P.C., Helena, Montana

        For Appellee:

                John C. Cruden, Assistant Attorney General, Elizabeth Ann Peterson,
                John L. Smeltzer (argued), James J. Dubois, Anna K. Stimmel, Appellate
                Attorneys, United States Department of Justice, Washington, DC

                                            Argued:  September 23, 2016
                                         Submitted:  September 27, 2016
                                           Decided:  December 28, 2016

Filed:

                    _____
                                    Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1　This is an appeal by Barthelmess Ranch, Double O Ranch, William French, Conni French, Craig French and M Cross Cattle (the Objectors) from the Water Court's August 11, 2015 Order Granting Partial Summary Judgment and Order Remanding to the Master. We affirm.

¶2　We restate the issues on appeal as follows:

> *Issue One: Whether the Water Court erred in concluding that the United States Bureau of Land Management (BLM) holds stockwatering rights under Montana law in reservoirs constructed on federal land for the use of permittees.*

> *Issue Two: Whether the Water Court erred in concluding that the United States owns reserved water rights for stockwatering by permittees in a pothole lake on federal grazing land under the 1926 Executive Order providing for Public Water Reserve 107.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3　In Montana's ongoing water rights claims adjudication proceedings, the BLM filed six water right claims related to five reservoirs and one natural pothole. The five reservoir claims are based in Montana law while the Pothole Lake claim is based upon a federal reservation of lands. The water sources are located wholly or partially on federal land, and the BLM claims the right to use each for stockwatering by its grazing permittees and for wildlife. In June 2014 the BLM moved for summary judgment on the objections raised to each claim. The Water Court consolidated those claims, objections and motions for summary judgment into the present single case.

2

¶4    In November 2014 the Water Master recommended summary judgment in favor of the BLM on each of these claims, finding that the claims were valid and properly owned by the BLM.  The Objectors objected to the Water Master's recommendation, but agreed in briefing that the BLM had the right to obtain water rights in its name under Montana law for use on federal lands.[1]  The Objectors stated the issue as whether the BLM "under applicable state and federal laws, actually made appropriations for beneficial use."  The Objectors contend that the BLM did not perfect any water rights and sought an order from the Water Court transferring all of the claimed BLM water rights to the current grazing permittee on the federal lands, and an order terminating all the wildlife claims. The Water Court upheld the Water Master's recommendation in most respects, and the Objectors appeal.

¶5    The following is a summary of the BLM claims involved in the present case. Windy Day Reservoir (Claim 40M 74594-00) was built by the BLM in August 1955 with the participation and cost-sharing of Marie Karstens-Redding, the BLM grazing permittee at the time.  The French objectors in the present appeal own property surrounding the Windy Day Reservoir. They claim that as early as 1911 individual "free grazers" who were ancestors or predecessors to their current land interests (hereafter "ancestral free grazers") "owned livestock" on the land now containing this reservoir.

¶6    North Flat Creek Reservoir (Claim 40M 74590-00) was built by the BLM in 1937. It is partially located on lands patented by Elsie Kemp/Tole in 1923 and conveyed to the

---

[1] Federal law recognizes the jurisdiction of state courts to resolve federal water rights claims.  43 U.S.C. § 666; *Confederated Salish & Kootenai Tribes v. Clinch*, 2007 MT 63, ¶¶ 12-13, 336 Mont. 302, 158 P.3d 377.

Frenches in 1995. Frenches filed a statement of claim to a use right for stockwater out of the reservoir. They claim that as early as 1911 ancestral free grazers placed livestock on the land now containing this reservoir.

¶7      Tallow Creek Reservoir (Claim 40M 74670-00) was built by the BLM in June 1936. The Objectors contend that ancestral free grazers in the area of this reservoir owned livestock there as early as 1915, and that their stock grazed in the area and drank water.

¶8      Sharon Reservoir (Claim 40M 74883-00) was built by the BLM in 1961 with the assistance of the Oxarart Brothers, grazing permittees at the time. M Cross is a grazing permit successor to Oxararts and has repair and maintenance responsibility for the reservoir. M Cross claims that its ancestral free grazers "owned livestock" on property around Sharon Reservoir "as early as 1917" and that they grazed and watered the stock.

¶9      The Water Court found as undisputed facts that the preceding four reservoirs were developed by the BLM and that the BLM's claimed priority date for each stockwater right is the date the reservoir was completed. The BLM does not own livestock, but provides the water for use by grazing permittees and others. The Water Court found that the reservoirs have been "consistently used for stockwatering since they were completed."

¶10     The Water Court found that it was undisputed that none of the Objectors or their predecessors filed claims for stockwatering from any of the sources of water that are

4

impounded in the reservoirs. The exception is the claim filed by Lela and William French, claim 40M 169526-00, for stockwater from the North Flat Creek Reservoir.

¶11 The Water Court noted that the common law elements of a valid (use right) appropriation of water are intent to appropriate, notice of the appropriation, diversion and beneficial use. *In the Matter of the Adjudication of Existing Rights (Bean Lake III)*, 2002 MT 216, ¶ 10, 311 Mont. 327, 55 P.3d 396. Prior to 1973 an appropriator in Montana could secure a water right simply by putting the water to a beneficial use. *Mont. Trout Unlimited v. Mont. DNRC*, 2006 MT 72, ¶ 5, 331 Mont. 483, 133 P.3d 224. The Water Court concluded that impoundment of water in a reservoir is a sufficient diversion of water to support a claim to a use right of water under *Bean Lake III*, and noted that the Objectors contested only whether the BLM had applied the water to a beneficial use. The Objectors contended that since the BLM did not own any livestock of its own, it did not use water from the reservoirs and therefore could not have perfected the stockwatering claims under Montana law.

¶12 The Water Court resolved this issue by applying this Court's venerable opinion in *Bailey v. Tintinger*, 45 Mont. 154, 122 P. 575 (1912), relied upon by both the BLM and the Objectors. *Bailey* established that a person, association or corporation could appropriate water under Montana law "to sell, rent, or otherwise dispose to others." Under the principles of the *Bailey* case, an appropriation of water for the use of others was complete upon completion of the diversion system (in this case the reservoirs) and making the water available for use by others. *Bailey*, 45 Mont. at 166-67, 122 P. at 579.

The Water Court concluded that these principles applied to appropriations by the United States and that ownership of stock was not required to complete the appropriation. Finally, the Water Court determined that participation by non-governmental parties in the construction or maintenance of some of the reservoirs did not affect the validity of the BLM claims because Montana law recognizes that multiple claims may exist in the same source of water. *St. Onge v. Blakley*, 76 Mont. 1, 23, 245 P. 532, 536 (1926); *Mont. Trout Unlimited*, ¶ 7.

¶13   The BLM acquired the Funnells Reservoir (Claim 40M 74655-00) in 1951 when it acquired some of the surrounding property. At that time the dam was in place providing 1.2 acre feet of water storage. The BLM claims a priority date in this reservoir of August 1945. A portion of the reservoir is on Barthelmess land, and Barthelmess filed a stockwater claim in the reservoir. Barthelmess also contends that its ancestral free grazers had stock in the area around Funnells as early as 1915. The Water Court found as an undisputed fact that the reservoir has been used for stockwater consistently since the BLM acquired its interest in the property.

¶14   The Water Court concluded that under Montana law the BLM acquired any appurtenant water rights when it acquired the property. Section 85-2-403(1), MCA; *Maclay v. Missoula Irrig. Dist.*, 90 Mont. 344, 353, 3 P.2d 286, 290 (1931). In addition, the Water Court rejected the Objectors' argument that the BLM could not show when the reservoir was constructed or when it was actually used for stockwatering, and that the BLM water claim therefore could only date from when it acquired the property in 1951.

6

The Water Court noted that this argument was inconsistent with the Objectors' own contention that they derived rights from their ancestral free grazers who had grazed animals in the same area since 1915. In addition, the Water Court held that under Montana law a statement of water right claim is prima facie evidence of its content, § 85-2-227, MCA, and *Teton Co-Op Canal Co. v. Teton Coop Reservoir Co.*, 2015 MT 344, ¶ 20, 382 Mont. 1, 365 P.3d 442, and that the Objectors had not carried their burden to prove that essential elements of the BLM water right claim were incorrect. As was the case with the prior BLM reservoirs, the Water Court noted that under Montana law two parties can claim ownership in water rights from the same source.

¶15 Pothole Lake (Claim 40M 74579-00) is a natural feature[2] located on BLM land that has been available for use by others. The Objectors, for example, claim that Frenches or their ancestral free grazers grazed stock in the area of the Pothole as early as 1917. The BLM claims a reserved water right in the Pothole with a priority date of April 1926. The claim of a reserved right is based upon the Stock Raising Homestead Act (SRHA) enacted by Congress in 1916 and the Public Water Reserve (PWR) No. 107 signed by the President in April 1926. The SRHA allowed the Secretary of the Interior to reserve lands that "contain waterholes or other bodies of water needed or used by the public for watering purposes." 43 U.S.C. § 300 (1912). The subsequent PWR 107 reserved all springs and water holes on vacant, unappropriated, and unreserved public

---

[2] A "pothole" in this context usually describes a natural depression in the landscape that contains water.

land throughout the country. The Water Court found that the Pothole Lake was part of the reservation of land and water provided for by PWR 107.

¶16 The Objectors contended as to all of the BLM claims, that their ancestral free grazers grazed the land and watered their stock in the available water sources long prior to construction of any of the BLM reservoirs. The Objectors contend that they thereby obtained the sole and paramount right to all of the waters at issue in this case and that any BLM claims to water should therefore be transferred to them.

¶17 The Water Court concluded that any stockwatering by the Objectors' ancestral free grazers were direct uses from the water sources, unaided by reservoir impoundments, and are therefore separate from the subsequent BLM reservoir claims. The governing principle of water law is that the existence of a prior right or claim in a particular water source does not preclude appropriation of subsequent rights from the same source. *St. Onge*, 76 Mont. at 23, 245 P. at 536; *Mont. Trout Unlimited*, ¶¶ 7-8. This principle is at the core of appropriation water rights under Montana law, allowing multiple appropriators to enjoy rights from the same source of water. The Objectors' claim that prior use by their ancestral free grazers precludes later claims by the BLM or any other person or entity is contrary to the precepts of prior appropriation.

¶18 The Objectors also argued that prior Water Court decisions support their argument that they should be given title to the right to use the water stored in the BLM reservoirs.[3] The Water Court disagreed with the Objectors' construction of these decisions.

---

[3] *Edwards v. BLM*, Water Court Case No. 40E-A (Water Court Opinion June 29, 2005); *Hamilton Ranches v. BLM*, Water Court Case No. 41G-190 (Water Court Opinion July 19, 2005).

Construing its own decisions, the Water Court found that "neither case addressed any restriction on BLM ownership of stock claims on federal land or found that stock rights on federal land must be owned by permittees." In addition, one of the cases "recognizes that stock rights on federal land are routinely owned by the BLM."

¶19 In addition to BLM stockwater claims, the BLM also claimed the right to provide water for wildlife at each of the reservoirs and the Pothole Lake. The Objectors argued that any wildlife use was only incidental to stockwatering, and that the BLM never intended to appropriate water for wildlife, never gave notice of any intent to do so, and never took steps to put water to use for wildlife, thereby precluding any claim under Montana law. The Water Court disagreed, finding that claims for fish, wildlife and recreational use are recognized by Montana law, and that no diversion is required when a diversion is not necessary for the wildlife use. *Bean Lake III*, ¶ 40.

¶20 The Water Court determined that the nature and extent of a water claim for wildlife use "depends on the specific facts surrounding the claimed appropriation" and that wildlife claims must be supported by evidence of intent to appropriate, notice of intent and application of the water to a beneficial use. The Water Court relied upon statements by Congress referencing management of BLM lands for stock and for wildlife as showing intent to do so. In addition, publication of these Congressional statements and enactments gave notice that the BLM intended to appropriate for wildlife. The Water Court found that developing the reservoirs was sufficient appropriation to consummate a right for wildlife uses. Because wildlife uses require less water than consumptive uses

9

such as stockwatering, adding wildlife uses to each of the reservoirs did not expand the amount of water claimed. Therefore, as to the four reservoirs constructed by the BLM, there was sufficient proof of a water right for wildlife.

¶21 As to the Funnells Reservoir, the BLM acquired it as a constructed facility in 1951. The Water Court found that the same Congressional enactments that supported a wildlife claim for the first four reservoirs, constructed by BLM, also supplied the required intent for Funnells. While Funnells was originally constructed for stockwatering, the Water Court found that when the BLM acquired it in 1951, wildlife had already benefitted from its water, and after that time it was also managed for wildlife use. This represented a change in the stockwater right the BLM acquired with the reservoir. The law in effect at the time of this change, § 89-803, RCM (1947, repealed in 1973), required no prior approval for a change in use, and the wildlife claim did not represent a new appropriation because it did not expand the amount of water used. Therefore under that statute the Water Court determined that the priority date for the wildlife use related back to the priority of the original appropriation in 1945, before the BLM acquired the facility.

¶22 As to the Pothole Lake, the Water Court determined that there are factual issues that remain to be decided concerning the wildlife claim for that water source. The Water Court remanded the wildlife portion of the Pothole Lake claim to the Water Master for further proceedings.

¶23 The Water Court last determined that the volume of water for each of the BLM claims remained unresolved. While the BLM argued that the Objectors had not refuted its volume claims, the Water Court accepted the Objectors' argument that they had not been given a full and fair opportunity to present evidence as to the volume of water that should be decreed to each of the BLM storage claims. Therefore the Water Court remanded all of the BLM claims to the Water Master for further proceedings on the volume of each of the BLM storage claims.

¶24 The Objectors appeal.

## STANDARD OF REVIEW

¶25 This Court recently set out the standards of review in an appeal from the Water Court's review of a Water Master's report. *Heavirland v. State*, 2013 MT 313, ¶¶ 13-16, 372 Mont. 300, 311 P.3d 813; *Skelton Ranch v. Pondera County Canal & Res. Co.*, 2014 MT 167, ¶¶ 25-27, 375 Mont. 327, 328 P.3d 644. In summary, the Water Court reviews the Water Master's findings of fact under the "clearly erroneous" standard, and reviews the Water Master's conclusions of law to determine whether they are correct. This Court reviews the Water Court's decision under the same standards as applied to the review of District Court decisions.

## DISCUSSION

¶26     *Issue One:  Whether the Water Court erred in concluding that the United States Bureau of Land Management (BLM) holds stockwatering rights under Montana law in reservoirs constructed on federal land, for the use of grazing permittees.*

¶27     The Objectors argue that the BLM did not properly perfect state law water rights in the reservoirs and so may not maintain claims in the adjudication process.[4]  As noted above, perfecting a water appropriation claim in Montana prior to 1973 required an intent to appropriate, notice of the appropriation, diversion and beneficial use, *Bean Lake III*, ¶ 10.   While the Objectors acknowledge that Montana law allows an appropriator to appropriate water for sale or distribution to others, they contend that the BLM does not qualify to do so.   The Objectors also contend that the BLM never applied water to a beneficial use because it did not own any livestock and therefore could not have perfected the stockwatering claims.

¶28     The parties argue that *Bailey* either supports or defeats the BLM water claims.  A primary issue in *Bailey* was whether a person could appropriate water under Montana law "to sell, rent, or otherwise dispose to others" without otherwise using the water himself.  This Court in *Bailey* held that Montana law recognized that an appropriation of water to be used by others was complete upon construction of the diversion system (such as a reservoir) and making the water available to others.  *Bailey*, 45 Mont. at 166-67, 122 P. at 579.  This Court recently explained the holding in *Bailey*:

> The appropriation of water for sale has long been accepted as a beneficial use.  Our first Constitution in 1889 explicitly recognized the right to sell

---

[4] This argument excludes the claim for the Pothole Lake, which is not a claim based in state law.

12

and rent water to others as a beneficial use. Mont. Const. art. III, § 15. The verbiage used in the 1889 Constitution referencing the sale of water was imported almost verbatim nearly one hundred years later into the 1972 Constitution. *Compare* Mont. Const. art. IX, § 3 *with* Mont. Const. art. III, § 15 (1889). This constitutional provision, along with its interpretations in our case law, clearly shows a steadfast commitment to recognizing the ability to appropriate water for its ultimate use by a third party.

*Curry v. Pondera County Canal & Reservoir Co.*, 2016 MT 77, ¶ 25, 383 Mont. 93, 370 P.3d 440 (internal citations omitted). The Water Court in the present case concluded that these principles applied to appropriations by the United States, and that Montana law did not require that the BLM own and graze livestock to perfect a water right.

¶29 The Objectors next argue that *Bailey* established a rule that only a "public service corporation" can appropriate water for use by third parties. The Objectors argue that since the BLM is not a "public service corporation" it cannot perfect its claims to appropriate water for the use of others under Montana law. An examination of the *Bailey* Opinion shows that the Objectors misconstrue its holding.

¶30 The dispute in *Bailey* involved water right claims in Big Timber Creek. In 1892 three individuals commenced work on an appropriation of water, some for their own use and the rest to "sell, rent, and otherwise distribute" to others. One of those individuals, named Hatch, succeeded to the interests of his former partners in the appropriation; an individual named Wormser succeeded to Hatch's interests; and a subsequently-organized canal company succeeded to the interests of Wormser. The canal company continued to construct miles of canals and ditches to distribute the water to customers, and its interests were acquired by yet another company. By 1910 the original appropriation by Hatch and

his partners was being used to distribute water to others who were irrigating about 1000 acres. A controversy arose with other appropriators over whether successive enlargements to the capacity of the system were new appropriations or whether they related back to the original Hatch appropriation in 1892.

¶31 The *Bailey* Opinion traced the history of Montana law relating to the appropriation of water, *Bailey*, 45 Mont. at 166-75, 122 P. at 581-82, concluding that since 1877 Montana law "specifically recognized the right of an *individual* to appropriate water to rent or sell to another." *Bailey*, 45 Mont. at 174, 122 P. at 582 (emphasis added). The *Bailey* Court noted that since 1907 it has "been held that the appropriator need not be either an owner or in possession of land in order to make a valid appropriation for irrigation purposes." *Bailey*, 45 Mont. at 175, 122 P. at 582. Further:

> In cases of appropriation for the purpose of supplying water to others, we do not understand how it can be said that the use of the water is an essential element of its appropriation. If the intended appropriator constructs the works and appliances necessary for the diversion of the water and the carrying of it to points where its use is desirable and profitable, and has actually carried it there, or is ready and willing to do so and offers it to all persons who are willing to pay for its use, we apprehend that his appropriation is complete.

*Bailey*, 45 Mont. at 177, 122 P. at 583. The *Bailey* Court warned that unless such appropriations were allowed it would "retard the reclamation of arid lands" in areas where the "magnitude of the undertaking is too great for individual enterprise." The Court warned that failure to adopt such a policy could also defeat the land reclamation goals of the United States in making appropriations "as a corporation or individual" for use by others. *Bailey*, 45 Mont. at 177, 122 P. at 583.

14

¶32    The *Bailey* Court then declared it the public policy of the State of Montana to encourage "public service corporations" to appropriate water for sale, rental or distribution to others. *Bailey*, 45 Mont. at 177, 122 P. at 583. The *Bailey* Court did not define "public service corporations." At the time the *Bailey* case was litigated the entity that owned the original Hatch appropriation from Big Timber Creek was called the "Glass-Lindsay Land Company." The *Bailey* Opinion stated that Glass-Lindsay was "organized under the laws of this state" with the "authority to purchase or construct an irrigation system and to sell, rent or otherwise dispose of water." *Bailey*, 45 Mont. at 161, 122 P. at 577. The Objectors assume from this that Glass-Lindsay was organized as a corporation under Montana law and that organization as a corporation under Montana law was therefore a vital prerequisite to appropriating water for the eventual use by others.

¶33    This assumption is not warranted by the *Bailey* Opinion, which clearly did not limit appropriations for sale or use by others to "public service corporations." Critically, the Objectors' construction of *Bailey* overlooks the fundamental fact of the case that the appropriation at issue there was commenced by three individuals; was then owned by one of those individuals; and was then owned by another individual before the canal companies got involved. The actual water right at issue in *Bailey* was therefore initiated by individuals, and not by a "public service corporation." It is also significant that the priority date for the appropriation in *Bailey* related back to the date that the three individuals put the water to use, and was *not* the later date when the canal companies

15

appeared. Regardless of the fact that the *Bailey* Opinion referred to the entity holding the appropriation at the time of the opinion as a "public service corporation," that entity was holding an appropriation initially established by individuals. And, significantly, the *Bailey* Opinion, as noted, expressly recognized the right of the United States to proceed under Montana law to appropriate water to sell, rent or otherwise dispose of to others.

¶34 Under the law established in *Bailey*, there is no "public service corporation rule," but only the recognition of a public policy of the state of Montana to allow and even encourage individuals and entities who are able to do so to appropriate water and make it available for use by others. *Curry*, ¶ 25. We also reject as being without support, the Objectors' argument that the BLM cannot appropriate water under Montana law because it does not separately charge grazers for the use of the reservoir water. Charging money for the water is not a requirement of perfecting a water right for "sale, rental or disposal to others." As long as the water is made available for sale, rental, or *distribution or disposal* to others, it is a valid appropriation under *Bailey*. As we recently held, Montana law "clearly shows a steadfast commitment to recognizing the ability to appropriate water for its ultimate use by a third party." *Curry*, ¶ 25.

¶35 The Dissent argues that the BLM has never put water to a beneficial use. To the contrary, recognition that storage of water as BLM has done is a beneficial use is expressly provided by the Montana Constitution: "The use of all water that is now or may hereafter be appropriated for sale, rent, distribution, or other beneficial use . . . and the sites for reservoirs necessary for collecting and storing water shall be held to be a

16

public use." Mont. Const. art. IX, § 3(2); *Curry*, ¶¶ 31-33. We agree with the Water Court that the BLM was entitled to proceed under Montana law to appropriate water in its reservoirs for use by grazing permittees and others.

¶36 The Objectors also argue that the BLM claims are invalid because the BLM did not appropriate any water, but "simply facilitated use of water already appropriated" by their ancestral free grazers in the early 20th century. This argument cannot be supported under Montana water law. First, as previously noted, it has long been the common law and then statutory law in Montana that multiple appropriators can claim water rights from the same source, and that the first in time has the best right. It is well known that there have been so many different appropriators on some water sources that the waters have become "over appropriated" in that the amount of water claimed by all the appropriators far exceeds the water actually available. *Mont. Trout Unlimited,* ¶¶ 7-8. While over-appropriation creates its own issues, it does not mean that the person or entity that made the first use on a water source acquired the right to exclude any other person or entity from claiming water from the same source. Far from it, as we have said, a fundamental precept of Montana water law is that multiple claims can exist on a single source of water. Adopting the Objectors' position would cause chaos in Montana prior appropriation law. Senior appropriators could claim not just that they had the earliest right to use water in a stream, but also that no one else could claim rights from that stream because the senior appropriators were there first—an argument contrary to the

17

fundamental precepts of prior appropriation law. *Federal Land Bank v. Morris*, 112

Mont. 445, 456, 116 P.2d 1007, 1012 (1941).

¶37    The BLM is not claiming water rights based upon any ancestral free-grazer

stockwater use in the early years of the twentieth century such as that cited by the

Objectors.    The BLM claims are clearly based upon subsequent appropriations via

reservoir construction.  The earliest BLM claim in this case is 1926 (Pothole Lake) and

the latest is 1961 (Sharon Reservoir).  If the Objectors hold any viable stockwatering

claims based upon water use in the first decades of the twentieth century, those rights are

separate from and clearly would be senior to, any reservoir rights claimed by the BLM.[5]

As the Water Court concluded, those early water uses were direct from the source,

unaided by any reservoir storage.  Any right arising from the ancestral free grazing before

World War I is separate from the later BLM reservoirs, and the existence of prior rights

does not preclude subsequent appropriation of water from the same sources.  Each right

has its own priority in time.

---

[5] The Objectors assert, and the Water Court seems to have agreed, that their ancestral free grazers utilized water on public lands to water their stock a hundred or more years ago. However, at least in the briefing in this appeal, the Objectors do not cite any specific water right claim based upon this historic stockwatering. The Water Court noted that at least as to claims to water in the BLM reservoirs, Montana law required that the Objectors file their claims by July 1, 1996, at the latest, and that if they failed to do so, they lost their right to make such claims. Section 85-2-226, MCA; *Matter of the Adjudication of Water Rights in the Yellowstone River*, 253 Mont. 167, 175, 832 P.2d 1210, 1214 (1992). The Water Court specifically held, however, that under § 85-2-222(1), MCA, failing to file on in-stream stockwater uses is optional and that the Objectors could still voluntarily file claims on those rights if they choose to do so. The Objectors do not expressly claim that the BLM claims are objectionable because the reservoirs interfere with the Objectors' prior rights to water.

¶38 Second, the Objectors contend that the BLM's construction of the reservoirs "did not constitute a new appropriation" but "simply modified" the prior stockwatering practices by their ancestral free grazers. It is certainly true, as the Objectors concede, that a direct-flow water user can add a reservoir to stabilize the available water so that it can be used throughout the year, without creating a new appropriation. *Teton Cooperative Res. Co. v. Farmers Cooperative Canal Co*., 2015 MT 208, 380 Mont. 146, 354 P.3d 579. This is not what happened in the case of the BLM reservoirs. The BLM does not claim any earlier direct-flow water rights. It claims only new rights to stored water, with appropriation dates in the mid-twentieth century. Contrary to the Objectors' argument, this situation is materially different from the one considered in *Teton*. Additionally, In *Granite County v. McDonald,* 2016 MT 281, 385 Mont. 262, ___ P.3d ___, decided November 3, 2016, we upheld the water right of a subsequent reservoir owner to impound water on a stream as long as it did not interfere with the senior rights of downstream direct-flow users. In fact, that relationship had been recognized by a water right decree entered in 1906. This, and not *Teton*, represents the present situation with regard to the BLM reservoirs and the rights, if any, deriving from ancestral free grazers. The BLM rights are separate rights with their own priority dates.

¶39 We emphasize that the foregoing analysis of the Objectors' claims is based upon fundamental and long-established principles of Montana water law. The first in time is the first in right, and multiple persons may therefore perfect claims to water from the same source as is the case across the breadth of our State. Ignoring this fundamental

principle to uphold the Objectors' claims in this case would throw Montana water rights into chaos. Water use by the Objectors' ancestral free grazers does not, under established Montana law, preclude the BLM or any other person or entity from making a claim of water right in the same source. Further, it could not be more clear that for over one hundred years Montana has recognized the right of individuals and entities to appropriate water for the sale, rental, or distribution to others. There is no "public service corporation" limitation upon this important principle of law. It has long been the public policy of Montana to recognize and encourage the benefits to agriculture and stock raising that flow from allowing appropriations that make water available for the use of others. We are unwilling to depart from these bedrock principles of Montana water law in this case. Finally, the principle of loss by "nonuser" (Dissent ¶ 66, quoting *Bailey*), is not an issue in this case and the Water Court has yet to adjudicate the quantity of the BLM rights.

¶40    Because we agree with the Water Court that the BLM has valid appropriations under Montana law, and that there is no basis in fact or in law to assign ownership of the BLM claims to the Objectors, we decline to consider the Objectors' arguments concerning the authority of the Water Court to do so.

¶41    *Issue Two: Whether the Water Court erred in granting partial summary judgment on the Pothole Lake claim when there were genuine issues of material fact.*

¶42    The Water Court noted that the Objectors did not challenge the fact that PWR 107 can serve as the basis for a reserved stock water right on federal land. In fact, it is well established that the SRHA and PWR 107 provide a valid basis upon which the federal

government can support claims to reserved water rights. Other state courts have recognized the validity of these claims in their water adjudication processes. *United States v. Denver*, 656 P.2d 1, 32 (Colo. 1982) (Court agreed that the federal government has "reserved rights to provide a watering supply for animal and human consumption . . . so that no person could monopolize or control vast areas of western land by homesteading the only available water supply."); *United States v. Idaho*, 959 P.2d 449, 452 (Idaho 1998) ("After considering the plain and ordinary words of the enabling statutes and executive order underlying PWR 107, we conclude that PWR 107 evidences an express intention by Congress that reserves a water right in the United States.")[6] These courts recognized that giving a single party control of these reserved water sources could lead to the monopolization of the water and surrounding land, contrary to the express intent of Congress.

¶43 The Objectors' challenge to the Pothole Lake water claim is based upon arguments that it is too small to qualify for reservation under PWR 107; that the BLM has never listed the Pothole in its inventory of such reserved water sources; and that the BLM did not present this claim to the Montana Reserved Water Rights Compact Commission. The Objectors cite a federal regulation from 1980 which states that the reservation provisions of SRHA and PWR 107 should not be applied to "small springs or water holes affording

---

[6] Reserved water rights were recognized in *Winters v. United States*, 207 U.S. 564, 28 S. Ct. 207 (1908), a case arising from Montana, holding that when Congress established Indian reservations it impliedly reserved sufficient water to satisfy the purposes of that reservation, with a priority date as of the creation of the reservation. This concept has been extended to include all types of federal reservations of land. *Cappert v. United States*, 426 U.S. 128, 138, 96 S. Ct. 2062 (1976).

21

only enough water for the use of one family and its domestic animals."[7]  The Water Court noted that while the Objectors contend that the Pothole is too small to qualify for reservation, at the same time they contend that they and their ancestral free grazers have grazed stock there since the early twentieth century.  They also contend that the Pothole right should be transferred to the Objectors for the same stockwater use.  These inconsistent positions, the Water Court concluded, undermined the Objectors' position on this claim.

¶44    The original PWR 107 in 1926 reserved "*every spring or waterhole*, located on unsurveyed public land."  (Emphasis added.)  The broad language of the reservation clearly included this Pothole Lake and there is nothing to indicate that the original reservation has been reversed.  The Objectors misconstrue the 1980 regulation language that they rely upon.  That regulation did not retroactively unreserve water sources like the Pothole Lake that had been reserved since 1926.  Rather, the regulation implemented statutory changes that Congress made in 1976, intended to limit *future* reservations of federal land.  *United States v. Idaho*, 959 P.2d at 453.  The regulation that the Objectors rely upon has no effect upon the original intent of SRHA and PWR 107 and does not provide any support for an argument that the property has been unreserved.  The BLM's failure to inventory this Pothole was likewise not significant in light of the original

---

[7] The Objectors contend that State guidelines provide that a single family requires 1.5 acre feet of water per year, which is slightly more than is supplied by the Pothole.  This guideline provides no authority that this Pothole Lake is no longer part of the reserved lands of the United States.

22

withdrawal, and while the BLM could have submitted its claim to the Reserve Water Right Compact Commission, it was not required to do so.

¶45 We agree with the Water Court's conclusion that the Pothole Lake was properly reserved by an act of Congress in 1926 and that nothing raised by the Objectors supports any change in that status. We find no evidence that the Water Court made any determination based upon contested issues of material fact. The Water Court denied summary judgment as to the volume of each of the BLM claims and remanded to the Water Master for further proceedings to resolve those issues.

¶46 The decisions of the Water Court are affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE

Justice Laurie McKinnon, dissenting.

¶47 The Court's conclusion that the claims of Objectors (Stockowners) are separate from the claims of BLM ignores that both share the same beneficial use: BLM's claims are premised upon the actual beneficial use of water consumed by Stockowners' cattle. In order to conclude that BLM has perfected its claim, which may only be characterized

23

as overlapping Stockowners' claim, the Court again revisits *Bailey* and erodes, further, the long established principle in western water law that the application of water to beneficial use is essential to a completed appropriation. This time the Court ignores *Bailey*'s express language limiting it to public service corporations and expands *Bailey*'s narrow exception, which has been undisturbed for a century, to include "anyone" who "distributes" water has perfected a water right. By concluding BLM has a water right in the *same* water which has been placed to an actual beneficial use for over a century by Stockowners, the Court distorts *Bailey*; fails to address well-reasoned Montana and federal water law; and upends the touchstone of the prior appropriation doctrine that the application of water to beneficial use is essential to a completed appropriation.

¶48     It is well to consider, once again, the situation of the arid West prior to passage of several congressional acts, in particular, the Taylor Grazing Act of 1934. To do so, provides a foundation for our consideration of these overlapping claims and the purpose underlying the rule that application of water to a beneficial use is essential to a completed appropriation. The following excerpt eloquently explains the struggles of Montana pioneers and the role Congress understood it should play in development of the lands and waters of the arid West.

> In the beginning, the task of reclaiming . . . [the arid West] was left to the unaided efforts of the people who found their way by painful effort to its inhospitable solitudes. These western pioneers, emulating the spirit of so many others who had gone before them in similar ventures, faced the difficult problem of wresting a living and creating homes from the raw elements about them, and threw down the gage of battle to the forces of nature. With imperfect tools, they built dams, excabated canals, constructed ditches, plowed and cultivated the soil, and transformed dry

24

and desolate lands into green fields and leafy orchards. In the success of that effort, the general government itself was greatly concerned -- not only because, as owner, it was charged through Congress with the duty of disposing of the lands, but because the settlement and development of the country in which the lands lay was highly desirable.

To these ends, prior to the summer of 1877, Congress had passed the mining laws, the homestead and preemption laws, and finally, the Desert Land Act. It had encouraged and assisted, by making large land grants to aid the building of the Pacific railroads and in many other ways, the redemption of this immense landed estate. That body thoroughly understood that an enforcement of the common-law rule, by greatly retarding if not forbidding the diversion of waters from their accustomed channels, would disastrously affect the policy of dividing the public domain into small holdings and effecting their distribution among innumerable settlers. In respect of the area embraced by the desert-land states, with the exception of a comparatively narrow strip along the Pacific seaboard, it had become evident to Congress, as it had to the inhabitants, that the future growth and well-being of the entire region depended upon a complete adherence to the rule of appropriation for a beneficial use as the exclusive criterion of the right to the use of water. The streams and other sources of supply from which this water must come were separated from one another by wide stretches of parched and barren land which never could be made to produce agricultural crops except by the transmission of water for long distances and its entire consumption in the processes of irrigation. Necessarily, that involved the complete subordination of the common-law doctrine of riparian rights to that of appropriation. And this substitution of the rule of appropriation for that of the common law was to have momentous consequences. It became the determining factor in the long struggle to expunge from our vocabulary the legend "Great American Desert," which was spread in large letters across the face of the old maps of the far west.

*California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 156-58, 55 S. Ct. 725, 728-29 (1935).

¶49    To ensure the success of the settlers' efforts and to encourage the economic development of these arid public lands, Congress passed the mining laws, the homestead and preemption laws, the Desert Land Act of 1877, and the Taylor Grazing Act of 1934.

25

Departure from the riparian rights doctrine employed in the eastern states allowed for severance of land and water, with the consequence that water could be appropriated away from the channels of its source. In considering the Desert Land Act, the Supreme Court explained, "[i]t is hard to see how a more definite intention to sever the land and water could be evinced." *California Oregon Power Co.,* 295 U.S. at 161, 55 S. Ct. at 730 (1935). Two years later, the Supreme Court again explained

> [t]he federal government, as owner of the public domain, had the power to dispose of the land and water composing it together or separately; and by the Desert Land Act of 1877 (c. 107, 19 Stat. 377), if not before, Congress had severed the waters constituting the public domain and established the rule that for the future the lands should be patented separately.

*Ickes v. Fox*, 300 U.S. 82, 95, 57 S. Ct. 412, 417 (1937).

¶50    The several congressional acts "simply recognize[] and give[] sanction, in so far as the United States and its future grantees are concerned, to the state and local doctrine of appropriation. . . . The public interest in such state control in the arid land states is definite and substantial." *California Oregon Power*, 295 U.S. at 164-65, 55 S. Ct. at 731-32. By these various acts passed in the mid-1800s, Congress authorized private individuals to appropriate water on the public domain through compliance with local laws and customs. To this end, the Mining Act of 1866, 43 U.S.C. § 661 (2012), provides:

> Whenever, by priority of possession, rights to the use of water for mining, agriculture, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by local customs, laws, and decisions of the courts, the possessors and owners of such vested rights shall be maintained and protected in the same[.] . . .

The Desert Land Act of 1877, 43 U.S.C. § 321 (2012), also provides:

That the right to use of water by the [entryman] . . . shall depend upon bona fide prior appropriation: and such right shall not exceed the amount of water actually appropriated, and necessarily used for the purpose of irrigation and reclamation: and all surplus water over and above such actual appropriation and use . . . shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights.

¶51 Finally, the Taylor Grazing Act of 1934 authorized the Secretary of the Interior to withdraw ". . . vacant, unappropriated, and unreserved lands from any part of the public domain of the United States . . . which in his opinion are chiefly valuable for grazing and raising forage crops . . . ." 43 U.S.C. § 315 (2012). The primary purpose of the Taylor Grazing Act was to ". . . preserve the land and its resources from destruction or unnecessary injury, to provide for orderly use, improvement, and development of the range . . . ." 43 U.S.C. § 315a. (2012) Thus, the Taylor Grazing Act did not reserve lands for a specific purpose, but was rather a management tool to establish grazing districts on the public domain and to ensure the orderly and efficient management of range resources. *Public Lands Council v. Babbitt*, 529 U.S. 728, 733, 120 S. Ct. 1815, 1819. Significantly, the Taylor Grazing Act did not provide an independent statutory basis for claims for federal water uses which would be inconsistent with the substantive requirements of state law. Indeed, the language of the Act itself provided:

[N]othing in this Act shall be construed or administered in any way to diminish or impair any right to the possession and use of water for mining, agriculture, manufacturing, or other purposes which has heretofore vested or accrued under existing law validly affecting the public lands or which may be hereinafter initiated or acquired and maintained in accordance with such law.

27

43 U.S.C. § 315b (2012). Hence, water rights located within grazing districts are subject to state substantive law.

¶52 The general rule recognized throughout the states and territories of the arid region was "that the acquisition of water by prior appropriation for a beneficial use was entitled to protection[.]" *California Oregon Power*, 295 U.S. at 154, 55 S. Ct. at 727. Local custom and usage of the West held that the first appropriator of water for a beneficial use had the better right to use of the water to the extent of actual use. Thus, fundamental to water law in the West is the principle that "*beneficial use* shall be the *basis*, the *measure* and the *limit* of all rights to the use of water." *McDonald v. State*, 220 Mont. 519, 530, 722 P.2d 598, 605 (1986) (emphasis in original). "State constitutions, statutes, and judicial decisions throughout the western states recognize the concept." A. Dan Tarlock, et al., eds., *Water Resource Management: A Casebook in Law & Public Policy* 195 (4th ed. 1993).

¶53 Montana fully embraced the western water law principle that every citizen has the right to the *use* of the waters in the streams of this state by declaring in our 1889 Constitution that "[t]he use of all water now appropriated, or that may hereafter be appropriated for sale, rental, distribution or other beneficial use . . . shall be held to be a *public use*." Mont. Const., art III, § 15 (1889) (emphasis added). This Court explained "public use" and set forth the controlling rule over a century ago in *Bullerdick v. Hermsmeyer*:

> The use of waters in the streams in this state is declared by the Constitution to be a public use. (Constitution, Art. III, sec. 15) Such being the case,

every citizen has a right to divert and use them, so long as he does not infringe upon the rights of some other citizen who has acquired a prior right by appropriation. Each citizen may divert and use them without let or hindrance when no prior right prevents. When his necessary use ceases, he must restore them to the channel of the stream, whereupon they may be used by any other person who needs them.

32 Mont. 541, 544-55, 81 P. 334, 338 (1905). Thus the 1889 Constitution declared that waters of this state are for "public use," and are not owned by any particular citizen as they are under the riparian doctrine. This important principle of "public use," which is distinct from and should not be confused with the "beneficial use" necessary to perfect a water right, has remained unchanged for a century. Montana's 1973 Constitution, art. IX, § 3 (2), similarly provides "the use of all water that is now or may hereafter be appropriated for sale, rent, distribution, or other beneficial use . . . shall be held to be a *public use*." (Emphasis added.) Significantly, to ensure continued adherence to the prior appropriation doctrine and the bedrock principle of beneficial use, the 1973 Constitution addressed specifically the requirement of "beneficial use" by expressly providing "[a]ll surface, underground, flood, and atmospheric waters within the boundaries of the state are property of the state for the use of its people and *are subject to appropriation for beneficial use as provided by law*." Mont. Const., art. IX, § 3(2) (emphasis added). As further protection of the prior appropriation doctrine and existing rights, the 1973 Constitution added that "[a]ll existing rights to the use of any waters for any useful or beneficial purpose are hereby recognized and confirmed." Mont. Const., art. IX, § 3(1).

Undisputedly, the requirement of beneficial use for a completed appropriation is deeply rooted in Montana's history.[1]

¶54    This Court, as well, has continuously recognized the significance of beneficial use in the prior appropriation doctrine. "Judicial opinions and scholarly commentators have repeatedly stated the rule that application to a beneficial use is the touchstone of the appropriation doctrine." *Bean Lake III*, ¶ 10. In Montana, like all other western states, to complete a valid appropriation an appropriator must: (1) demonstrate a bona fide intention to apply the water to some existing or contemplated beneficial purpose, and (2) *actually beneficially apply* the water to the intended lands. *Toohey v. Campbell*, 24 Mont. 13, 17, 60 P. 396, 397 (1900); *Bean Lake III*, ¶ 10 ("the true test of appropriation of water is the successful application thereof to the beneficial use designed"). Both elements need not occur simultaneously; rather, an appropriator is permitted a reasonable amount of time to actually apply the water to the intended lands. *McDonald*, 220 Mont. at 529, 722 P.2d at 604. However, until the appropriator perfects his water right by actual use, the appropriator holds only an "inchoate right" to the water. *Mont. Dep't of Natural Res. & Conservation v. Intake Water Co.*, 171 Mont. 416, 436, 558 P.2d 1110, 1121 (1976). Thus, the ultimate "application of the water to the intended beneficial use is the final step taken by the appropriator in acquiring an appropriative right" and the "[a]pplication of the water to such use is *absolutely essential* to acquisition of the right."

---

[1]    The Court confuses "public use" with "beneficial use." Opinion, ¶ 35. Montana's Constitution provides that reservoirs and storage are a "public use", not a beneficial use," and expressly recognizes the requirement that water, for a completed appropriation, must be applied to a beneficial use.

1 Wells A. Hutchins, *Water Rights Laws in the Nineteen Western States* 442 (1971) (emphasis added).

¶55     It is thus clear that in Montana, like all western states applying the prior appropriation doctrine, the true test of appropriation, and ultimately the perfection of a water right, is the successful application of water to a beneficial use. *Bean Lake III*, ¶ 10, citing *Thomas v. Guiraud*, 6. Colo. 530, 533 (Colo. 1993).  The right to use water has always depended on an actual appropriation of the water for a beneficial use.  *See Toohey*, 24 Mont. 11, 60 P. 396, 397.  The Montana Water Use Act of 1973 did not change this bedrock principle of the prior appropriation doctrine.

¶56     As relevant here, water rights on federal land may be acquired in Montana by private appropriation.  This Court has explained

> The legal title to the land upon which a water right acquired by appropriation made on the public domain is used or intended to be used in no wise affects the appropriator's title to the water right, *for the* bona fide *intention which is required of an appropriator to apply the water to some useful purpose may comprehend a use upon lands and possessions other than those . . . for which the right was originally appropriated.*

*Smith v. Denniff*, 24 Mont. 20, 29, 60 P. 398 (1900) (emphasis added, bona fide emphasized in original); s*ee also Hays v. Buzzard*, 31 Mont. 74, 81, 77 P. 423 (1904).

This Court held in *Bailey*:

> While the Act of 1870 . . . sought to limit the right to appropriate water for irrigation to persons or corporations owning or in possession of agricultural lands, the provision was omitted advisedly from the Codes of 1895 and 1907, and *it has since been held that the appropriator need not be either an owner or in possession of land in order to make a valid appropriation for irrigation purposes.*

31

45 Mont. at 175, 122 P. at 582 (emphasis added). Finally, this Court addressed the right

to appropriate water on federal lands in *St. Onge v. Blakely*, holding as follows:

> The right to use water may be owned without regard to the title to the land upon which the water is used; it is a possessory right which may be acquired by appropriation and diversion for a beneficial use; such a right can be acquired by a squatter on public lands . . . .

76 Mont at 18, 254, P. at 537. Finally, Wells A. Hutchins addressed the rule in Montana,

explaining:

> The Montana rule does not require fee simple title in the appropriator to land to be irrigated under his right. It does apparently contemplate that if the appropriator does not own the land he intends to irrigate, at least rightful possession – that is, a possessory interest – is necessary to his acquisition of a valid water right. This requirement is satisfied by lawful entry and settlement on public lands or a bona fide intent to acquire title to both land and water, or by one holding lands under contract for its purchase. Also acceptable is rightful possession of land under a contract with the owner the nature of which does not appear in the record.

Hutchins, at 263-64. *See also In re Powder River Drainage Area*, 216 Mont. 361, 702

P.2d 948 (1895) (validating stockwater rights appropriated by lessees on and for use on

school trust land, even though ownership accrued to state); *Sayre v. Johnson*, 33 Mont.

15, 81 P. 389 (1905) (recognizing validity of water rights appropriated on public domain

for use on school trust land, even though appropriator did not own or intend to patent

place of use); *Bullerdick v. Hermsmeyer*, 32 Mont 541, 81 P. 334 (1905) (recognizing

validity of water right appropriated to irrigate land appropriator only occupied on public

domain); *Hays v. Buzard*, 31 Mont. 74, 77 P. 423 (1904) (recognizing validity of water

right appropriated for use on land rented by appropriator) and *Toohey*, 24 Mont. 13, 60 P.

396 (denying claimant full amount of his claim, not for failure of possession or intent to

use, but because Act by which he acquired land was passed five years after his claimed irrigation appropriation).

¶57    The beneficial use contemplated in making an appropriation is one that inures to the benefit of the appropriator. *Smith*, 24 Mont. at 25, 60 P. at 401; *Maclay v. Missoula Irr. Dist.*, 90 Mont. 344, 353, 3 P.2d 286, 290 (1931). "When a water right is acquired by appropriation and used for a beneficial and necessary purpose in connection with a given tract of the land, it is an appurtenance thereto and, as such, passes with the conveyance of the land, unless expressly reserved from the grant." *Maclay*, 90 Mont. at 353, 3 P.2d at 290. *See also Yellowstone Valley Co. v. Assoc. Mtg. Investors*, 88 Mont. 73, 81, 295 P. 255, 257-58 (1930); *Lensing v. Saay & Hansen Security Co.,* 67 Mont. 382, 384, 215 P. 999, 1000 (1923). Accordingly, a water right appropriated on the public domain in accordance with Montana law and custom vests in the appropriator. *Osne Livestock Co. v. Warren*, 103 Mont. 284, 290, 62 P.2d 206, 209 (1936); *St. Onge*, 76 Mont. at 18, 245 P. at 537; *Smith*, 24 Mont. at 26-27, 60 P. at 400. When stockwater is appropriated on federal or leased lands, the water is used for the benefit of the appropriator's privately owned lands and becomes appurtenant thereto. Once perfected, the water right includes "an incorporeal hereditament . . . the right to have the water flow in the stream, without diminution or deterioration, to the head of the ditch or place of diversion, an easement in the stream . . . an easement not attached to land, and therefore akin to an easement in gross at the common law," which may or may not become an easement annexed or attached to particular land. *Smith*, 24 Mont at 25, 27, 60 P. at 400. The mere use of a

33

water right by the appropriator on land titled in another, however, does not necessarily make the water right appurtenant to that land. "A water right, legally acquired, is in the nature of an easement in gross, which according to circumstances, may or may not be an easement annexed or attached to certain lands as an appurtenance thereto. *Maclay*, 90 Mont. at 353, 3 P.2d at 290 (citing *Smith*, 24 Mont. 20, 60 P. 398).

¶58    Here, the stockwater appropriated on federal land, in accordance with state law and custom, established a valid water right that vested in the Stockowners as the appropriator. These stockwater rights do not attach to federal land as appurtenances, but instead are used for the benefit of Stockowners' privately owned lands and are appurtenant to those lands. *See In re Hamilton Ranches Partnership*, Mont. Water Ct. Case No. 41G-190; *In re Edwards*, Mont. Water Ct. Case No. 40E-A.

¶59    BLM argues that Stockowners water claims are not inconsistent with BLM's federal claims and that, when constructing dams and reservoirs on federal grazing lands to impound stream flows and create ponds or lakes to benefit livestock, the BLM appropriated water for beneficial uses within the plain terms of the Water Use Act and in accordance with principles of prior appropriation. The BLM argues there is no authority which precludes them from acquiring rights to impound water for stock in the reservoirs.

¶60    While there may be no authority precluding BLM from filing a claim, the manner in which a water right may be perfected under Montana law is well-established. BLM ignores that the "touchstone of the appropriation doctrine" and the "true test" of a water right is the application of water to a beneficial use. *Bean Lake III*, ¶ 10. As the beneficial

34

use contemplated in an appropriation is one inuring to the appropriator, *Smith*, 24 Mont. at 30, 60 at 401-02; *MacLay*, 90 Mont. at 353, 3 P.2d at 290, the present issue concerns whether the benefit of water use inures to the Stockowners, whose stock use the water, or to BLM, who manages the lands which have been severed from the water. Here, actual beneficial use was accomplished by the Stockowners' predecessors whose cattle drank the water BLM claims it has put to actual beneficial use. However, BLM is not the actual appropriator or proper owner of the water rights in these cases because the BLM never owned the livestock that appropriated the water or grazed federal lands. BLM may not claim as its actual beneficial use the actual beneficial use underlying Stockowners' claims or, for that matter, any other appropriator of water for livestock. Stockowners and their predecessors, not BLM, were the actual appropriators of the water.

¶61 Importantly, we did not hold in *Teton Coop.*, nor have we ever held that impoundment of water in and of itself is a beneficial use. In *Teton Coop.*, we held, "[w]ater storage, which stabilizes and conserves water supplies, is encouraged in this state." *Teton Coop.*, ¶ 12. We did not say that storage or impoundment of water was an actual beneficial use. BLM attempts to obscure its dilemma of having failed to put the water it claims to actual beneficial use by attaching either Stockowners' actual beneficial use or some yet to be determined livestock in the future; hence, the overlapping nature of the instant claims. However, our precedent clearly establishes that the benefit contemplated in an appropriation inures to the benefit of the appropriator. *Smith*, 24 Mont. at 25, 60 P. at 400; *Maclay*, 90 Mont. at 353, 3 P.2d at 290. The role of actual

beneficial use is significant to the outcome of these proceedings and cannot be overemphasized.

¶62　It is also clear that BLM's construction of reservoirs does not, by itself, entitle BLM to a water right. The construction of reservoirs is not the "touchstone" of a valid appropriation, as opposed to beneficial use. Moreover, it is well-established in Montana that "the right to use water may be owned without regard to the title to the land upon which the water is used. . . ." *St. Onge*, 76 Mont. at 18, 254 P. at 537; *see also Smith*, 24 Mont. at 29-30, 60 P. at 401. As demonstrated by the aforementioned authority, valid rights to appropriate are not perfected upon reservoir construction alone.

¶63　This brings me full circle to *Bailey*. BLM could not have perfected a water right because it never put the water to actual beneficial use under Montana law. The Court fails to appreciate the distinction between making a claim and perfecting a claim, which likely stems from the Court's similar confusion between a "public use" and a "beneficial use." Opinion, ¶¶ 35, 39. While it is well-established that "two parties may at the same time be in possession of water from a creek and neither hold adverse to the other . . . ," *St. Onge*, 76 Mont. at 16, 245 P. at 536, the question before the Court is not whether the use of water by a subsequent appropriator, BLM, can be said to be adverse or mutually exclusive of Stockowners' use. The question is whether BLM has perfected a water right by applying the water it claims to an actual beneficial use—the touchstone of the prior appropriation doctrine. Stockowners object to the perfection of BLM's claim because BLM has never applied the water to beneficial use except by overlapping Stockowners'

beneficial use or some yet to be determined livestock in the future.[2] Nonetheless, the Court reaches out to *Bailey* to find actual beneficial use for the BLM. This Court's distortion of *Bailey*, however, does not address the overlapping nature of the claims regarding actual beneficial use. Application to an actual beneficial use was a perfection requirement for both common law and statutory rights under *Bailey*. Casting aside a significant amount of federal and state water law, not to mention the prior appropriation doctrine, the Court simply announces that there is no "public service corporation rule," and that "as long as the water is made available for sale, rental or distribution or disposal, it is a valid appropriation under *Bailey*." Opinion, ¶ 33.

¶64 *Bailey* addressed the narrow exception to the general rule that water rights perfect only upon actual beneficial use. Due to the nature of a public service corporation and consistent with the goals of irrigating the arid West, *Bailey* explained that to hold a corporation to the "actual beneficial use" requirement would be impractical because the corporation could not perfect its right until the water was put to actual beneficial use through the assistance of third parties at some point in time in the future. However, *Bailey* never altered the requirement that there be actual beneficial use for a valid appropriation.

¶65 In *Bailey*, we discussed the parties' varying views on whether actual beneficial use is necessary to perfect a water right for a public service corporation. We explained that

---

[2] The Court insists on interjecting, unnecessarily, new terminology into an area of law well entrenched in Montana's history. The evidence clearly established that Stockowners' "ancestral free grazers," Opinion,¶ 39, were multi-generational ranching families who undisputedly established that they were successors-in-interest to the stockwater now claimed by the BLM.

under the corporation's "theory thus advanced, the claimant who proceeds under the statute, and performs the acts required as set forth [in the statute], *has a completed appropriation* of water upon the completion of the work on his ditch, canal, or other means of diversion, *even before the water is actually applied to a beneficial use.*" *Bailey*, 45 Mont. at 174, 122 P. at 582 (emphasis added). We contrasted this view with the traditional principles advanced by the objectors wherein "it is held that *actual application* of the water to a beneficial use is a *necessary prerequisite* of a completed appropriation[.]" *Bailey*, 45 Mont. at 174, 122 P. at 582 (emphasis added). We rejected the latter view "as to a public service corporation" because the "public policy of this state [is] to encourage these public service corporations" to develop the arid regions and corporations would be unwilling to do so without the certainty of a completed appropriation. *Bailey*, 45 Mont. at 177, 122 P. at 583.

¶66   We made the following holdings. First, we agreed with the corporation that it could perfect a water right based on future beneficial use, explaining that, while the statute requires "beneficial use," the beneficial use "may be prospective or contemplated." *Bailey*, 45 Mont. at 175, 122 P. at 582. Second, we held that "as to a public service corporation, its appropriation is complete when it has fully complied with the statute and has its distributing system completed and is ready and willing to deliver water to users upon demand, and offers to do so." *Bailey*, 45 Mont. at 177-78, 122 P. at 583.   Lastly, we concluded that the extent of the appropriation is limited by:  (1) the corporation's "bona fide intention at the time" the appropriation is made; (2) the

38

corporation's reasonably anticipated "needs"; and (3) the "capacity" of the corporation's diversion. *Bailey*, 45 Mont. at 178-79, 122 P. at 583-84. We further imposed a condition subsequent on the right, concluding that the right may be lost by "nonuser for an unreasonable length of time." *Bailey*, 45 Mont. at 179, 122 P. at 584.

¶67 BLM is not organized as a public service corporation under Montana law for purposes of *Bailey*. More fundamentally, BLM manages grazing districts and forage land. BLM cannot be characterized as an entity formed or created for the purpose of appropriating water for sale, distribution, or rental to others; and, indeed, such a claim would be inconsistent with the purpose of the Taylor Grazing Act. Grazing permits and fees are not issued for the purpose of selling, renting, and distributing of water.

¶68 In contrast, Bureau of Reclamation projects, as in *Bailey*, are organized for the purpose of selling, renting, and distributing water in exchange for users paying back the costs of construction of the projects. Significantly, the United States Supreme Court has already held that the Bureau of Reclamation, which *is* organized for the purpose of distributing water, does *not* own the water sold and distributed to its users. In *Ickes*, 300 U.S. at 94-95, 57 S. Ct. at 416-17, the Supreme Court explained

> Although the government diverted, stored and distributed the water, the contention of petitioner that thereby ownership of the water or water-rights became vested in the United States is not well founded. Appropriation was made not for the use of the government, but, under the Reclamation Act, for the use of the land owners; and by the terms of the law and of the contract already referred to, the water-rights became the property of the land owners, wholly distinct from the property right of the government in the irrigation works.

Recall the Supreme Court's early precedent, as well, recognizing severance of land and water in order to facilitate irrigation and economic growth in the arid West. Appropriation, as recognized in *Ickes*, was not for the use of BLM, but for the use of landowners to water their livestock and fields. Furthermore, in contrast to the Bureau of Reclamation whose sole purpose is the distribution of water, BLM, pursuant to the Taylor Grazing Act, manages grazing districts, forage, and land. The conclusion reached in *Ickes*, that the water rights became the property of the landowners as against a federal agency whose purpose was to distribute water, undermines this Court's reliance on *Bailey*. *Ickes* is consistent with the prior appropriation doctrine that a completed appropriation inures to the appropriator upon application of water to actual beneficial use.

¶69 Without actual beneficial use, there can be no water right. BLM attempts to perfect a water right on the basis that it constructed reservoirs, owns the lands beneath the reservoirs, and has the duty to manage grazing districts. None of these assertions establish a valid water right under Montana law. The Court's expansion of *Bailey* distorts bedrock principles of the prior appropriation doctrine; namely, that the application of water to beneficial use is essential to a completed appropriation which inures in the appropriator. *Bailey* certainly does not recognize that *offering* or making *available for future consumption* is an application of water to an actual beneficial use. To conclude otherwise would be tantamount to permitting water rights to be created without an actual use and then indefinitely held without any actual use until the appropriator sees fit. It has long been established that water is too scarce a resource to speculate with. *See*

*Thorpe v. Freed*, 1 Mont. 651, __ P. __ (1872). BLM has never put the water it seeks to appropriate to a beneficial use; it simply overlaps its claims with those of the Stockowners and unnamed stockowners in the future. Here, BLM made available water, through its partial participation in the construction of reservoirs, which was to be consumed by Stockowners' livestock. Stockowners' livestock put to actual beneficial use Stockowners' water, and it is therefore Stockowners who own these water rights under Montana law and not the BLM.[3]

¶70    Finally, I disagree with the Court's decision regarding PWR107 and believe the Court has misunderstood Stockowners' objections. Stockowners maintain that, for purposes of summary judgment, the court should not have assessed the pothole size. More particularly, Stockowners argue that in utilizing the DNRC stockwater consumption guideline it applied one standard for calculation to the exclusion of another, with neither party advocating a particular standard or calculation as to how many animals could be watered from the pothole. Further, Stockowners argue that the DNRC guideline was applied inconsistently in that the court did not consider the domestic consumption standard (1.5 acre-feet per household), which demonstrates that there was not enough water in the pothole to meet even domestic needs.

¶71    The Water Court and this Court appear to decide this issue on the basis that Stockowners position was inconsistent with their position that historically the pothole had been used to water cattle. However, as Stockowners point out, reserved rights are

---

[3] The Montana Water Court can modify or adjust any claim element to the extent supported by the evidence of historical use. *McDonald v. State*, 220 Mont. 519, 722 P.2d 598 (1986); *Mont. Trout Unlimited v. Beaverhead Water Co.*, 2011 MT 151, ¶¶ 21, 23, 361 Mont. 77.

evaluated, adjudged, and quantified by considering the use intended by the federal legislation; in contrast, state based rights are evaluated in accordance with historic use. *State ex rel Greely v. Confederated Salish & Kootenai Tribes*, 219 Mont. 76, 89, 712 P.2d 754, 762 (1985). For these reasons, summary judgment on the PWR 107 was inappropriate and I would reverse and remand for further proceedings.

¶72 I dissent.

/S/ LAURIE McKINNON